944 F.2d 372
 56 Fair Empl.Prac.Cas. (BNA) 1664,
57 Empl. Prac. Dec. P 41,006
Joseph F. TENNES, Plaintiff-Appellee, Cross-Appellant,
v.
COMMONWEALTH OF MASSACHUSETTS, DEPARTMENT OF REVENUE and
Stephen W. Kidder, as Commissioner, Commonwealth
of Massachusetts, Department of Revenue,
Defendants-Appellants, Cross-Appellees.
 Nos. 90-2443, 90-2475, 90-2510, 90-2656 and 91-1344.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 17, 1991.
Decided Sept. 30, 1991.
As Amended Oct. 31, 1991.
 
 Anthony S. Graefe, Brian Steinbach (argued), James R. Cox, Banta, Cox & Hennessy, Chicago, Ill., for plaintiff-appellee, cross-appellant.
 Philip C. Stahl (argued), Lynn H. Murray, Grippo & Elden, Chicago, Ill., for defendants-appellants, cross-appellees.
 Before COFFEY, MANION and KANNE, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Joseph Tennes sued his employer, the Commonwealth of Massachusetts, alleging unlawful discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. A jury found that the Commonwealth had discriminated against Tennes because of his age. The jury further found the Commonwealth's discrimination to be willful. The court entered judgment on the jury verdict for back pay, liquidated damages, costs and attorney fees. The Commonwealth motioned for judgment notwithstanding the verdict (JNOV) which was denied by the district court.
 
 
 2
 The Commonwealth appeals only the district court's refusal to overturn the jury's willfulness verdict and its award of attorneys' fees to the extent the award is attributable to Tennes' success on the willfulness claim. Tennes cross-appeals from the district court's denial of his requests for reinstatement, post-judgment back pay, front pay and injunctive relief. The jury verdict and the court's judgment awards are affirmed. 745 F.Supp. 1352.
 
 A. Facts
 
 3
 Joseph Tennes was an employee of the Commonwealth of Massachusetts, working in the Multistate Bureau of the Massachusetts Department of Revenue. Tennes worked in the Bureau's Chicago office. The Bureau is responsible for auditing out-of-state enterprises which do business in Massachusetts. The audits monitor compliance with Massachusetts tax laws to ensure those enterprises pay all state taxes owed. The Chicago office audits and collects taxes from corporations based in the Midwest.
 
 
 4
 Tennes began working for the Commonwealth in 1983. The Commonwealth fired him in 1986 at the age of 58. Tennes worked as a tax auditor, conducting field audits of Midwestern businesses which are, or might be, liable for Massachusetts taxes. During his employment, Tennes was the oldest auditor in the Chicago office.
 
 
 5
 The chief of the Chicago office during the time of the events relevant to this case was Donald H. Lamb, then about 36 years old. Lamb's superior, the Chief of the Multistate Bureau, was Bernard F. Crowley. Crowley during times relevant to this case was in his early forties. Crowley's immediate superior was Stephen B. Shiffrin, Deputy Commissioner of the Department of Revenue and responsible for the Enforcement Division (which includes the Multistate Bureau).
 
 
 6
 The evidence presented to the jury showed that immediately after Lamb assumed control of the Chicago office, he began making deprecating comments about Tennes' advanced years. These comments were generally derogatory references to the presumed senility, physical decrepitude and sexual impotence associated with Tennes' old age. Some representative statements include: "There he is, grey hair, false teeth"; and "send someone along on the audit so he doesn't get lost." Lamb once mentioned to the office that Tennes was "white on top and burned out on the bottom," and on another occasion, Lamb, upon seeing Tennes, announced to the office in a loud sarcastic voice, "There he is, grey hair, false teeth.... Probably can't get it up." On the surface Tennes occasionally reacted to some of the remarks with good humor, but nevertheless found them humiliating.
 
 
 7
 Other auditors testified that Lamb often ridiculed Tennes in front of other staff members speculating that Tennes was unsuited for his job because he was "so old he would probably forget [Bureau procedures and objectives]"; or "so old he probably needs [help] to carry his bags [on business trips]." At one point, Tennes sternly (and publicly) informed Lamb that he had enough of these age-related comments and that he didn't want to hear any more.
 
 
 8
 On May 1, 1986, shortly after Tennes demanded Lamb cease making hostile age-related comments, Lamb issued to Tennes the first of a series of damaging disciplinary notices known as Formal Corrective Action ("FCA") memoranda. The first FCA accused Tennes of being inefficient and unobservant of proper Bureau procedures. The memo was very vague in that it failed to specify any particular occurrence which prompted Lamb's generalized criticisms of Tennes' efficiency or competence. The critical FCA was routed to Multistate Bureau Chief Crowley and was included in Tennes' personnel file.
 
 
 9
 The next round of FCAs from Lamb to Tennes was prompted by a business trip Tennes took to audit several Michigan-based taxpayers. On the week of August 4-8, 1986, Tennes signed out of the office to do field audits of corporate taxpayers in the Detroit, Michigan area. He worked at the first audit August 4 and 5, calling his office collect the first day to notify them of his whereabouts, and the second day to notify them that he had finished the audit and would be at the next taxpayer's location the following day. He worked at the second taxpayer's office on August 6 and 7, calling his office shortly after noon Detroit time on August 7 to discuss some technical tax issues. Later that afternoon, Tennes conducted an exit interview with the tax manager for the second taxpayer. After concluding his meeting with the second taxpayer, Tennes concluded he was too late to catch the evening flight back to Chicago on August 7, and decided to stay the night in Detroit. He already had a discount ticket for the next day anyway, and it would cost extra to change the flight.
 
 
 10
 On August 8, Tennes made several unsuccessful attempts to contact a representative of a third Detroit area corporate taxpayer to collect some necessary documents for a pending tax assessment. He checked out of his hotel room after breakfast. He then returned his rental car and flew back to Chicago. Lamb claims that the Bureau tried to locate Tennes on August 7 and 8 by telephone at the hotel and at the taxpayer's business offices but was unsuccessful. Lamb became suspicious of Tennes' activities on these days during his business trip. He discussed the prospect of Tennes being "absent without leave" with Crowley. Crowley stated that if that was the case Tennes would be fired.
 
 
 11
 Tennes arrived in Chicago about 2:20 p.m. and went directly home, arriving between 3:50 and 4:00 p.m. It was a Friday afternoon, and if Tennes had decided to return to work after arriving from Detroit he would have reached the office at quitting time.
 
 
 12
 Tennes returned to work Tuesday, August 12, 1986 and found in his desk drawer four disciplinary FCA memoranda: all four disciplinary FCA memos were dated August 4, 1986, and one was dated August 8, 1986. The first FCA criticized him for executing an unsatisfactory "Pre-Audit Plan" (a proposal designating who was being audited, type of tax being examined, and the tax years the audit would cover) with respect to the prospective audit of a taxpayer in South Bend, Indiana. The second FCA criticized him about delays in another audit he was working on. The third FCA criticized him for an error he allegedly made on a taxpayer notice which resulted in significantly reducing the amount of time the Bureau had to collect a tax assessment. The fourth FCA complained about Tennes' apparent unfamiliarity with certain new and old auditing procedures. Lamb was made conscious of Tennes' unawareness in casual conversation with Tennes--not as a result of difficulties in Tennes' work product. Each FCA was written and issued by Lamb, circulated to Chief Crowley, and inserted in Tennes' personnel file. The basis and substance of the criticisms contained in each FCA are highly questionable and were disputed.
 
 
 13
 Lamb was away at a conference when Tennes returned to work August 12, but acting Chief Donald Kaspan informed Tennes that Lamb wanted a complete accounting of his time on August 7 and 8. Tennes prepared a handwritten explanation in preparation for his eventual meeting with Lamb. The following Monday Lamb had a conference with Tennes, where Tennes proffered his notes and oral explanation of his whereabouts during the past week. Lamb responded that he and Bureau Chief Crowley had discussed the situation, and were not satisfied with what they believed to be Tennes' deliberate absence from work. Lamb informed Tennes that preparations were being made to terminate his employment.
 
 
 14
 Later, and unknown to Tennes, Lamb sent Crowley a copy of a memo dated August 18, 1986 which was ostensibly addressed to Tennes but never sent to him. The memo outlined Lamb's suspicions that Tennes had violated work procedures during the last two days of his recent excursion to Detroit. The memo claimed that Tennes had improperly left the audit site before the end of the regular working day August 7, and that he had taken unauthorized leave from work on Friday, August 8. By way of proof, the memo stipulated that Lamb had tried to telephone Tennes on August 7 and 8 at the hotel and at the taxpayer's offices. However, as it turned out, the office phone bills for August 7 and 8 did not support Lamb's claim. In the August 18 memo, Lamb recommended that Tennes be discharged. Lamb supplemented his memo with a call to Crowley telling him that Tennes did not provide a written explanation for his whereabouts (when he in fact had), that he gave conflicting stories about events in Detroit, and that he was generally dishonest.
 
 
 15
 Crowley scheduled a conference with Deputy Commissioner Shiffrin and familiarized him with the current information. Both were familiar with the general poor performance of the Chicago office in the past. Crowley, as he would testify, made no independent investigation of the Tennes matter specifically. The only evidence he could present to Shiffrin was the critical FCAs that Lamb had issued against Tennes and Lamb's representation of Tennes' activities in Detroit. By letter dated August 26, 1986, Crowley discharged Tennes from employment, effective September 12, 1986, for "unsatisfactory performance of ... official duties and responsibilities including ... continued failure to adhere to bureau policies and procedures in the conduct of audit assignments."
 
 
 16
 Following the notice of his discharge, Tennes, in a four-page letter dated September 9, 1986, wrote to Crowley requesting reconsideration of his termination. In that letter, Tennes pointed out the inaccuracy of the FCAs he had received, and clarified his itinerary during that fateful Detroit business trip. Tennes also noted that the punishment of termination was excessive in relation to his purported offenses and contrary to the Bureau's Administrative Procedures Manual. These procedures outlined a method of dispensing administrative sanctions on a graduated basis--mild punishment for earlier offenses followed by termination for persistent deficiencies in work habits and incompetence.
 
 
 17
 This letter also tangentially, at least, raised the issue that age discrimination may have been a factor in his hasty and severe treatment. Tennes told Crowley that "[a]s you are aware I am the oldest and one of the most experienced auditors in the Chicago office," and "Mr. Crowley, there were several disparaging remarks made in the office concerning my age and being the oldest in the office." Crowley referred the matter to Shiffrin who eventually scheduled a hearing in Cambridge, Massachusetts to discuss the circumstances of the termination and decide whether to reinstate Tennes.
 
 
 18
 On September 16, 1986, Lamb wrote a memorandum to Crowley responding to Tennes' letter. Lamb began his memo by stating: "In summary, I'm not at all surprised that he has taken this approach. He was terminated from Maryland ['s Department of Revenue] in 1982 and he also brought an age discrimination lawsuit against them." (Emphasis added.)
 
 
 19
 Attached to Lamb's memo was an affidavit in which the signatories attest and "agree that to the best of their knowledge and belief, no age discriminatory remarks were made to Joe Tennes or about Joe Tennes by any employee of the Midwest Regional office during his employment for the Commonwealth." Lamb circulated this affidavit for signatures among the Bureau's staff shortly after Tennes was fired. It later turned out that a significant number of staff members refused to sign it because it was untrue. Crowley passed on the memo and affidavit to Shiffrin before the scheduled hearing with Tennes.
 
 
 20
 The appeal hearing was held on October 15, 1986 and was attended by Shiffrin, Lamb, Tennes and Myrna Masse, the Commonwealth's Labor Relations attorney. Tennes was read a list of unspecific complaints concerning his job performance and the suspicious events relating to his Detroit business trip. Shiffrin asked Tennes to comment or respond to the complaints. At no time did Shiffrin or Lamb address Tennes' remarks or engage him with justifications for their actions in light of Tennes' explanations. Shiffrin took no notes during the meeting, preferring to sit at the conference table and play with a rubber band. Shiffrin did not quiz Tennes on possible age discrimination, although he was aware of such references in Tennes' letter and the direct challenge to them in Lamb's letter and affidavit. At the time Shiffrin knew age discrimination was generally unlawful. By letter dated October 31, 1986, Shiffrin informed Tennes he would not reinstate him.
 
 
 21
 Tennes brought suit against the Commonwealth in U.S. District Court charging willful age discrimination in employment in violation of the ADEA, 29 U.S.C. § 621, et seq. After a trial, the jury's special verdict found for Tennes on the issues of age discrimination and willfulness, in the process finding that he was meeting his employer's legitimate expectations and that the Commonwealth's reason "for discharging and failing to reinstate" Tennes was a mere pretext for age discrimination. The district court entered judgment on the verdict.
 
 
 22
 Both parties filed post-trial motions. The Commonwealth sought JNOV or a new trial on both the issues of their liability under the ADEA and their willfulness violation of the ADEA. The district court denied the Commonwealth's motion.
 
 
 23
 Tennes' motion sought to amend the judgment to award (1) back pay and liquidated damages plus post-judgment interest; (2) reinstatement, including full restoration of benefits, or in the alternative front pay including pension credit and a ten-year pension; (3) injunctive relief; (4) postjudgment back pay pending until the date of reinstatement; and (5) costs and attorneys' fees. The district court granted Tennes' request for back pay, liquidated damages, interest, costs and attorneys' fees, but denied reinstatement, injunctive relief or post-judgment back pay. The court then entered judgment in Tennes' favor in the amount of $124,497.76 for the liability verdict, $124,497.76 for the willfulness verdict, and $106,740.32 in costs and attorneys' fees.
 
 
 24
 The Commonwealth has satisfied the liability judgment and the award of fees and costs with interest. The Commonwealth appeals only from the district court's denial of their JNOV motion on the willfulness claim and the award of attorneys' fees to the extent the award relates to Tennes' success on the willfulness claim. Tennes appeals the district court's denial of reinstatement or front pay, injunctive relief, and post-judgment back pay.
 
 
 25
 B. Jury Finding of Willful Violation of the ADEA
 
 
 26
 Under the ADEA, Tennes is entitled to liquidated damages if he establishes that the Commonwealth's discrimination against him on the basis of age was willful. 29 U.S.C. § 626(b). The Commonwealth, on appeal, argues that while Lamb himself may be legitimately accused of discriminatory conduct, Tennes was actually fired by Crowley--against whom no allegation or proof of discriminatory intent was ever raised. Furthermore, the Commonwealth argues that Shiffrin simply reviewed Tennes' discharge after the fact and supported the discharge on grounds unrelated to age, noting also that Shiffrin too is free of any allegation or proof of harboring an age-related animus. Therefore, the Commonwealth urges that activities relating to Shiffrin are completely irrelevant for purposes of determining whether Tennes was fired with willful disregard of the ADEA. Essentially, the Commonwealth argues, despite the jury verdict to the contrary, that Tennes failed to carry his burden of proof. The Commonwealth contends that based on the foregoing, the jury's finding that it willfully violated the ADEA's prohibition of agebased discharges is not supported by any evidence and the district court should have granted the Commonwealth's motion for JNOV.
 
 
 27
 "We review a district court's denial of a motion for judgment notwithstanding the jury's verdict de novo." Bright v. Land O' Lakes, Inc., 844 F.2d 436, 441 (7th Cir.1988). "We determine whether the evidence presented, combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." Christie v. Foremost Ins. Co., 785 F.2d 584, 585-86 (7th Cir.1986). Any conflicts in the evidence must be resolved in favor of the party winning the verdict, and every permissible inference favoring that party must be drawn. Syvock v. Milwaukee Boiler Mfg. Co., 665 F.2d 149, 153 (7th Cir.1981). In undertaking this evaluation, we will not reevaluate the credibility of witnesses, nor "otherwise consider the weight of the evidence." Goldman v. Fadell, 844 F.2d 1297, 1300 (7th Cir.1988).
 
 
 28
 In reviewing the Commonwealth's arguments, we find ourselves in partial agreement. As the Commonwealth suggests, some of the evidence that was introduced for the jury's consideration concerning the willfulness component of this case did involve post-termination events such as Tennes' letter to Crowley, Lamb's defensive memorandum and deceptive affidavit and Shiffrin's apparent nonchalance during (and after) Tennes' review hearing in Cambridge. This court has recently held that post-violation statements and events provide no support for the argument that a defendant had acted in a reckless manner when it committed a violation of the ADEA. Overgard v. Cambridge Book Co., 858 F.2d 371, 377 (7th Cir.1988). "The determination of whether an employer violated the ADEA with knowledge or reckless disregard turns on the employer's mental state when the alleged violation was committed." Id. Generally, the proper focus of the jury's inquiry into willfulness is whether the circumstances and events leading up to and including the decision to terminate the plaintiff proves, by a preponderance of the evidence, that the defendant knowingly or with reckless disregard violated the ADEA. Normally, post-termination statements, memos, letters, etc., which are not probative of the employer's pre-termination mental state and which did not affect the decision to terminate are immaterial. We therefore agree with the Commonwealth that post-termination activity in relation to Shiffrin's review of Tennes' discharge should not be part of the evidentiary basis for a finding of willfulness. However, we agree with Tennes that the Commonwealth did not preserve this argument in the trial proceedings and has thus waived it on appeal. Even as late as its post-trial Motion for Judgment Notwithstanding the Verdict or for New Trial, the Commonwealth failed to argue that a finding of willfulness cannot be supported by the evidence of events occurring after Tennes' discharge. For example, in its JNOV motion the Commonwealth wrote:
 
 
 29
 The parties agree that there were two decisionmakers in this case; Bernard Crowley, who decided to discharge [Tennes], and Stephen Shiffrin, who held a hearing on the issue of [Tennes'] discharge and refused to reinstate him.... Under any version of the facts, there is no evidence that Crowley, Shiffrin or Lamb knew or showed reckless disregard for whether their conduct violated the ADEA.
 
 
 30
 (R. 88, Motion for JNOV or New Trial, p. 2)
 
 
 31
 The Commonwealth went on to argue that the accumulated evidence presented by Tennes (including post-termination statements and events) did not support the jury's finding of willfulness. Never did the Commonwealth advance an evidentiary distinction between pre-and post-termination evidence in the proceedings below. In fact, judging from the trial record, including the JNOV motion and the quoted passage above, the Commonwealth viewed the relevant events in this case as a continuum beginning with Lamb's negative remarks and extending up to and including Shiffrin's review and failure to reinstate. At no time during the trial did the Commonwealth object to Tennes' introduction of post-termination evidence, even knowing that Tennes' purpose in submitting such evidence was to prove willfulness. In a section of its JNOV motion captioned The Jury Relied On Inadmissible Evidence, the Commonwealth simply pointed out to the court the unreliability of certain statistical tables and charts introduced at trial by Tennes and the likelihood such evidence may have had in misleading the jury. Significantly, the Commonwealth did not object to the court's special verdict questions which asked the jury "[d]o you find that the [Commonwealth] has stated a reason other than age for [Tennes'] discharge or failure to reinstate," and whether the Commonwealth's "stated reason for discharging and failing to reinstate [Tennes] was a mere pretext for age discrimination." Clearly, the Commonwealth's theory of defense at trial did not involve opposition to the relevance of post-termination events.
 
 
 32
 Only now, in its brief on appeal and in oral argument, does the Commonwealth advance what would have been an accurate contention that post-termination events should have been excluded from assessing the willfulness of the employer's state of mind at the time of a plaintiff's termination and before these events occurred. Their failure to raise this issue previously prevents them from raising it on appeal. Stern v. United States Gypsum, 547 F.2d 1329, 1333 (7th Cir.), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), and United States v. Tyrrell, 329 F.2d 341, 345 (7th Cir.1964). By allowing the post-termination evidence to go to the jury without objection, the Commonwealth is confined to the argument it made at trial--the evidence (all of it) is insufficient.
 
 
 33
 A review of all of the evidence substantiates Tennes' position. Lamb's conduct is well documented. The jury could easily conclude that Lamb's disparaging remarks about Tennes' age displayed a blatant age animus. In addition, when Tennes insisted that Lamb stop making the objectionable age-based remarks, Lamb issued a quick series of five critical, yet very questionable, FCAs. Not only was the timing of the FCAs suspicious, but the criticism contained in them was vague and even inaccurate. Based on the FCAs' timing and lack of substance, the jury could have found them meritless and pretextual. Tennes also introduced evidence suggesting that his termination was at that time disproportionately harsh in comparison to the disciplinary measures applied to younger workers for equal or greater offenses. Testimony indicated that younger workers received only warnings or short-term suspensions for offenses including persistent tardiness, persistent early departures from work or audit sites, failure to complete assignments, incorrect and faulty preparation of important documents, and mild insubordination. The jury could have compared the offenses of the younger workers and their associated penalties to the claimed offenses attributed to Tennes and conclude that Tennes' termination constituted discrimination in contravention of the ADEA.
 
 
 34
 In dealing with Tennes, the Bureau failed to follow its own prescribed progressive discipline procedures as outlined in its Administrative Procedures Manual. The Manual states:
 
 
 35
 Progressively More Severe Discipline: The initial discipline must relate to the severity of the act and then more severe penalties should be meted out for each additional offense. If, after warnings and disciplinary actions, the employee's conduct does not improve, s/he may be terminated. (Emphasis added.)
 
 
 36
 The policy seems to anticipate some milder penalties to be administered before termination. The jury was given evidence to the effect that this policy was not followed in Tennes' case and, in the context of Lamb's earlier expressed age animus, the jury could reasonably conclude that Tennes' unusual treatment violated the ADEA. Although at this point there was clearly sufficient evidence for the jury to find an ADEA violation, the Commonwealth would still have a plausible claim that, because Crowley and Shiffrin were not aware of Lamb's age animus, there was insufficient evidence to meet the higher willfulness standard.[1]
 
 
 37
 But unfortunately for the Commonwealth, the evidence that we must review in a light most favorable to Tennes does not end with the termination decision. After receiving the August 26 termination letter, Tennes, on September 9, wrote Crowley (with a copy to Shiffrin) a four-page single-spaced letter taking issue with all aspects of various references to his unsatisfactory performance. He made two seemingly benign references to age--"I am the oldest and one of the most experienced auditors in the Chicago office" (p. 1, second paragraph), and "... there were several disparaging remarks made in the office concerning my age and being the oldest in the office." (P. 4, second to last paragraph.) This is the first piece of evidence presented to the jury that indicated that Crowley or Shiffrin had notice that age could be an issue in Tennes' termination. The Commonwealth would argue that these obscure references were dwarfed by the real thrust of Tennes' letter. But they apparently were not obscure to Lamb.
 
 
 38
 In his September 16 memo to Crowley (who passed it on to Shiffrin), Lamb announced that "I am not at all surprised that he has taken this approach. He was terminated from Maryland in 1982 and he also brought an age discrimination lawsuit against them." After three pages of detailing Tennes' failures and derelictions, Lamb concluded his memo by stating "I believe the above is conclusive proof that Mr. Tennes was terminated for just cause and his termination was unrelated to his age." (Emphasis added.) Attached to the memo was an "Affidavit" signed by Lamb and five members of the Chicago office staff: "The undersigned have read this statement and agree that to the best of their knowledge and belief, no age discriminatory remarks were made to Joe Tennes or about Joe Tennes by any employee of the midwest regional office during his employment for the Commonwealth."
 
 
 39
 At this point the question of termination because of age is clearly before Crowley and Shiffrin. Yet everyone apparently ignored the issue at the October 15 reinstatement hearing in Cambridge. Tennes weakened his own claim for willfulness by not himself raising the age issue at the meeting when given the opportunity to discuss Lamb's allegations. At the same time, however, Shiffrin apparently acted passively and indifferently by not taking notes and by playing with a rubber band during the discussions.
 
 
 40
 As the district court noted in its order denying the Commonwealth's motion for JNOV, Tennes did not contend that at the time of termination Crowley was aware that Lamb's criticism may have been motivated by age discrimination. But the court went on to find:
 
 
 41
 The jury could reasonably infer that Shiffrin's actions were willful. Tennes contended at trial that Shiffrin was aware of the possibility that age had played a factor in the firing when he conducted a hearing on Tennes' discharge. In his appeal letter, Tennes stated that age disparaging remarks had been made concerning him and that he was the oldest person in the office.... Tennes also stated that Lamb had falsified the record. At the hearing, Shiffrin played with a rubber band, took no notes, and never asked Lamb to respond to Tennes' allegations of discrimination. Viewing the inferences in favor of Tennes, the jury was entitled to conclude that Shiffrin's behavior showed reckless disregard as to whether the firing of Tennes violated the ADEA.
 
 
 42
 Because of all of the post-termination evidence that was before the jury, we agree with the district court that the jury could have found that Shiffrin, who was the final decisionmaker in Tennes' employment status, showed reckless disregard for whether age was a determining factor that led to Tennes' termination. If a decisionmaker, relying on a supervisor's tainted termination recommendation, "was not a mere rubber stamp, but made an independent decision to fire [an employee], not only would there be no ground for finding willful misconduct by [the employer], there would be no ground for finding even an innocent violation of the Act." Shager v. Upjohn, 913 F.2d 398, 406 (7th Cir.1990). A violation of the ADEA "would be willful only if the employer knew he was violating the Act or--what amounts to the same thing--was indifferent to whether he was violating it or not: a state of mind the law calls 'reckless disregard.' " Id.
 
 
 43
 Crowley and Shiffrin admitted that they made no independent investigation into Tennes' situation. During and after the post-termination hearing Shiffrin made no effort to explore the age issue that had been placed squarely before him. As the district court concluded:
 
 
 44
 The Commonwealth concedes that both Shiffrin and Crowley decided to terminate Tennes. Shiffrin had the benefit of the appeal letter Tennes submitted.... In the appeal letter, Tennes raised the issue of age discrimination. Without investigating these charges, Shiffrin affirmed Crowley's decision. The jury could conclude that Shiffrin's decision was merely a rubber-stamp approval of the prior determination that was based on Lamb's age discrimination.
 
 
 45
 We conclude that the totality of the evidence, taken in a light most favorable to Tennes, was sufficient for the jury to conclude that the Commonwealth was guilty of a willful violation of the ADEA. Therefore, the district court's damages award stands and there will be no consequential reduction in the legal fee awarded by the district court.
 
 C. Tennes' Cross Appeal
 
 46
 The ADEA authorizes courts to grant "such legal and equitable relief as may be appropriate to effectuate the purposes of this chapter." 28 U.S.C. § 626(b). Neither reinstatement nor front pay are mandatory relief for a prevailing plaintiff under the ADEA; both lie within the discretion of the trial court after careful consideration of the particular facts of the case. McNeil v. Economics Laboratory, Inc., 800 F.2d 111, 118 (7th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); Hybert v. Hearst Corp., 900 F.2d 1050, 1056 (7th Cir.1990). A discretionary order will only be set aside if it is clear that no reasonable person could concur in the trial court's assessment. Patterson by Patterson v. Coca-Cola Bottling Co., Cairo-Sikeston, Inc., 852 F.2d 280 (7th Cir.1988). As we recently held in Anderson v. United Parcel Service, 915 F.2d 313, 315 (7th Cir.1990): "The district court's decision must strike us as fundamentally wrong for an abuse of discretion to occur."
 
 
 47
 We find that the district court did not abuse its discretion in any aspect of the damage award. The district court declined Tennes' motion for reinstatement. Citing McNeil, the court found that where the relationship between the parties is hostile and where there is no reason to believe the parties would enjoy a productive and amiable working relationship (as in the present case), reinstatement is not appropriate. McNeil, 800 F.2d at 118. The district court's conclusion that Tennes, after all that had transpired, would not enjoy the confidence or respect of current management, was not unreasonable.
 
 
 48
 Front pay should be awarded where needed to effectuate the purposes of the ADEA. McNeil, 800 F.2d at 118; Pudge v. Fruehauf Corp., 690 F.Supp. 692, 694 (N.D.Ill.1988). The jury verdict entitles Tennes to both back pay and liquidated damages. The district court's conclusion that this amount (nearly $250,000) is substantial compensation considering the relatively short time Tennes was employed by the Commonwealth is not "fundamentally wrong." In fact, we have previously held that front pay is less appropriate when (as in this case) liquidated damages are awarded. See McNeil, 800 F.2d at 118.
 
 
 49
 Also, front pay would be too speculative an award. As the district court noted, Tennes' future with the Bureau would most likely have been short-lived even absent the discrimination given the high turnover rate for Bureau employees and the fact that Tennes did have a weak employment history in general and with the Bureau in particular. For these reasons we also affirm the district court's denial of Tennes' request for post-judgment back pay. We decide that there was no abuse of discretion in the district court's decision that the present award sufficiently accomplishes the purposes of the ADEA and makes Tennes whole. McNeil, 800 F.2d at 118.
 
 
 50
 Tennes' request for injunctive relief from the discriminatory conduct by the Commonwealth is moot since he will not be reinstated to his former position.
 
 
 51
 For the reasons above, the decision of the jury and the district court is
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 Even though at the time of the termination decision Crowley and Shiffrin were apparently unaware of Lamb's age-related motive against Tennes, an argument could be made that if Lamb, even though not a decisionmaker, was motivated by willful age animus, that willfulness could be imputed to Crowley and Shiffrin. In Shager v. Upjohn Company, 913 F.2d 398 (7th Cir.1990), this court held that under certain circumstances a supervisor's discriminatory animus, innocently relied upon by another official responsible for making firing decisions, can be imputed to the employer. In Shager the supervisor may have (this was a reversal of a summary judgment, so certain facts were still in dispute) made negative recommendations about a subordinate to the decisionmaker that were motivated by age animus. This, we concluded, could be imputed to the employer who was unaware of the possible age animus
 Since the Commonwealth did not object to the inclusion of post-termination events into evidence, we need not determine whether willfulness is imputable in this case because the post-termination evidence was sufficient to show Crowley's and Shiffrin's own reckless disregard for whether age was a determining factor in Tennes' termination.