David COLEMAN, III, Plaintiff,

v.

Vincent LANE, et al., Defendants.

No. 92 C 2726.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 26, 1996.

Stephen B. Engelman, Jeffrey Paul Smith, Engelman & Smith, Skokie, IL, for plaintiff.

Matthew J. Piers, Jonathan A. Rothstein, Charles James Holley, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, Magistrate Judge.

Plaintiff David Coleman, III alleged that his employer, Defendant Chicago Housing Authority (the "CHA"), deprived him of his liberty and property interests in his employment without due process of law in violation of 42 U.S.C. § 1983. A jury awarded Plaintiff $155,000 in damages and, on April 29, 1994, this court ordered Defendant to reinstate Plaintiff to a position of comparable responsibility, with the seniority and benefits he would have received absent his discharge. The court further awarded Plaintiff back pay for the time from the entry of the jury verdict to the date of his reinstatement. (*See* Memorandum Opinion and Order, *Coleman v. Lane*, No. 92 C 2726, 1994 WL 171446, at *3 (N.D.Ill. May 2, 1994.))

Following this decision, Defendant filed, and Plaintiff responded to, several post-verdict motions addressing the validity of the jury's findings.[1] After this court concluded that the jury's verdict must stand, Plaintiff moved for an award of back pay and post-judgment interest, asking that the court make him whole not only for the pay lost between the jury verdict and the entry of judgment, but also for the time since the entry of judgment that the case remained before this court. On May 23, 1996, Defendant CHA filed a notice of appeal. One month later, however, CHA moved to dismiss that appeal, recognizing that this court's failure to award back pay in a sum certain rendered the judgment nonappealable.

During this lengthy period since the verdict (now extending over two and a half years), the CHA declined to reinstate Plaintiff; Plaintiff, in turn, failed to find alternate employment.[2] On June 25, 1996, Plaintiff

---

1. Defendant filed a motion to reconsider the verdict in light of the jury's seemingly inconsistent conclusions regarding the actions of the CHA and Defendant Vincent Lane. (Defendants' Motion for Judgment as a Matter of Law or in the Alternative for a New Trial.) This court initially granted Defendant's motion for a new trial (*see* Memorandum Opinion and Order, *Coleman v. Lane*, No. 92 C 2726, 1995 WL 170025 (N.D.Ill. April 7, 1995)) but, upon reconsideration, reinstated the original verdict in light of Plaintiff's newly advanced theory that Defendant had waived the argument relied upon in the court's original analysis. (*See* Memorandum Opinion and Order, *Coleman v. Lane*, No. 92 C 2726, 1996 WL 167044 (N.D.Ill. April 5, 1996).)

2. Happily, that has now changed; Plaintiff's counsel advised the court in a conference call on November 22, 1996 that his client has been

submitted an undated, unsigned piece of paper entitled "Amended Calculation of Back Pay & Interest, Coleman v. Lane" which demanded that the CHA compensate Plaintiff in the form of post-judgment interest, as well as post-judgment back pay-that is, back pay for a period beginning on the date of entry of the jury's verdict, and ending on the date Plaintiff actually recommences work. (Plaintiff's Amended Calculation of Back Pay & Interest, Coleman v. Lane (hereinafter "Pl.'s Amended Back Pay Petition")). Defendant challenges this amended back pay request, and both parties have submitted memoranda on the issue. For the reasons set forth below, this court grants Plaintiff's request for post-verdict back pay in the amount of $88,261.95.

### BACKGROUND [3]

Plaintiff seeks to add $105,529.37 to his initial $155,000 judgment—$94,261.95 in lost wages and benefits (accruing since the entry of the jury verdict), plus "at least" $17,267.42 in interest, less $6,000 in income offsets.[4] (Plaintiff's Reply in Support of Petition for Back Pay & Interest (hereinafter "Pl.'s Back Pay Petition"), at 8.) This request apparently stems from the fact that (1) Plaintiff has yet to be reinstated despite this court's April 29, 1994 order, and (2) the court granted Plaintiff back pay up to his date of reinstatement. (*See* Memorandum Opinion and Order, *Coleman*, 1994 WL 171446, at *3.) Defendant has refused to give Plaintiff his job back, choosing to wait until the completion of the appeals process. At the same time, Plaintiff, unsuccessful in securing alternate work, has remained unemployed. There is evidence that Plaintiff earned some income while self-employed, but these efforts proved largely unprofitable. (Pl.'s Back Pay Petition, at 5.) Defendant contends that Plaintiff has failed to mitigate his damages as required in

wrongful discharge cases. (Defendant's Objection to Plaintiff's "Amended Calculation of Back Pay & Interest" (hereinafter "Def.'s Objection") ¶ 2–3.) Plaintiff argues that Defendant has failed to meet its burden of proving that Plaintiff's efforts to secure interim employment were inadequate. (Pl.'s Back Pay Petition, at 2–5.)

### DISCUSSION

This court must now determine whether Plaintiff is entitled to supplemental back pay, or whether he forfeited this right by failing to mitigate his losses. Before turning to the specific facts in this case, the court will briefly review the law of mitigation of damages.

#### A. Mitigation of Damages

■ By their very nature, wrongful discharge cases necessarily involve employees who suddenly find themselves out of work. These employees may be tempted to forego seeking new employment until the case is resolved because of the possibility of getting their jobs back or obtaining monetary judgments. *See, e.g., Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1428 (7th Cir.1986) (reducing plaintiff's back pay award because he left the labor force apparently "in the hope of someday being made whole by a judgment at law"). Even where the employee is successful in his claim against his employer, however, courts recognize that the employee cannot remain idle for the duration of the suit; rather, he must make affirmative efforts to secure alternate employment. *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1202 (7th Cir.1989) (citing *Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) for the general rule that a discharged employee must mitigate damages by using "reasonable

---

steadily employed since the conclusion of the briefing on the back pay issue.

**3.** Because the facts of this case are well-known to the parties involved, the following summation relates only to the specific motion addressed by the court at this time. For a more complete statement of the facts, see this court's Memorandum Opinion and Order, *Coleman v. Lane,* No. 92 C 2726, 1996 WL 167044 (N.D.Ill. Apr.5, 1996).

**4.** In his initial request for an amended calculation of back pay and interest, Plaintiff sought only $86,952.20–$70,175.08 in lost wages and benefits plus $16,777.12 in post-judgment interest. For purposes of this motion, the court uses the increased figures as stated in Plaintiff's Reply in Support of Petition for Back Pay and Interest.

diligence in finding other suitable employment").

■ Once a plaintiff has established that his employer unlawfully terminated his employment, a presumption in favor of full relief arises. *Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir.1989). The plaintiff must establish, nonetheless, the amount of damages (in the form of lost salary and benefits) to which he is entitled. *Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir.1990); *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir.1979). The employer may then assert as an affirmative defense the employee's failure to mitigate his losses. *Fleming*, 898 F.2d at 560. Under the Seventh Circuit's jurisprudence, proof of failure to mitigate requires a two-pronged showing: (1) that "the [plaintiff] was not reasonably diligent in seeking other employment," and (2) "that with the exercise of reasonable diligence there was a reasonable chance the [plaintiff] might have found comparable employment." *U.S. v. City of Chicago*, 853 F.2d 572, 578–79 (7th Cir.1988) (citation omitted); *Fleming*, 898 F.2d at 560; *Gaddy*, 884 F.2d at 318 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)).

■ A plaintiff's duty to mitigate damages does not require him to "go into another line of work, accept a demotion, or take a demeaning position." *Graefenhain*, 870 F.2d at 1202 (quoting *Ford Motor*, 458 U.S. at 231, 102 S.Ct. at 3065). Furthermore, an employee "need not seek employment which is not consonant with his particular skills, background, and experience or which involves conditions that are substantially more onerous than his previous position." *Id.* (quoting *Ford Motor*, 458 U.S. at 231 n. 16, 102 S.Ct. at 3065 n. 16) (internal citations omitted). This does not mean, however, that the plaintiff may spend an insufficient amount of time and effort looking for work. *See Payne v. Security Sav. & Loan Ass'n, F.A.*, 924 F.2d 109, 111 (7th Cir.1991) (upholding reduction of plaintiff's back pay award for two-year period during which his job search efforts consisted of spending merely "two or three days a month" and "[a] few hours a week, maybe a month" looking for employment).

### B. The *Parties' Arguments*
#### 1. *Rule 11(a)*

■ With this background in mind, the court now turns to the parties' arguments in this case. Defendant first challenges Plaintiff's amended calculation as a violation of Fed.R.Civ.P. 11(a). Specifically, Defendant maintains that the document fails to comply with the requirements of Rule 11(a) because it is unsigned, unsupported and unexplained.[5] Thus, Defendant contends, the court cannot consider Plaintiff's new request. (Def.'s Objection ¶ 1.)

Plaintiff does not specifically address this argument; instead, he reiterates his monetary claim within the context of his signed memorandum in support of back pay. (Pl.'s Back Pay Petition, at 8.) The Advisory Committee Notes to Rule 11(a) state that a party may correct its failure to sign a document by "signing the paper on file or submitting a duplicate that contains the signature." FED. R.CIV.P. 11(a); *Abdul–Wadood v. DeBruyn*, 89 F.3d 838 (7th Cir.1996). The court finds that Plaintiff's submission of his memorandum in support of back pay suffices to remedy any Rule 11(a) violation in this case. *Cf. Abdul–Wadood*, 89 F.3d 838 (affirming dismissal of case without prejudice where unrepresented plaintiffs failed to individually sign their complaint despite court's order to cure the deficiency).

#### 2. *Failure to Explain the Back Pay Calculation*

■ As noted, Plaintiff bears the initial burden of establishing the proper amount of back pay. *Fleming*, 898 F.2d at 560. The document entitled "Amended Calculation of Back Pay & Interest" purports to adjust Plaintiff's back pay award to 1993, 1994, 1995 and 1996 dollars, while explicitly excluding

---

5. Rule 11(a) provides:
 Every pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name ... An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.
 FED.R.CIV.P. 11(a).

potential raises. (Amended Calculation; Def.'s Opposition ¶ 3.) According to Defendant, these adjustments, reflecting approximate three percent increases in Plaintiff's projected annual income, have no basis in fact. (Def.'s Opposition ¶ 3.) Defendant asserts that there is no evidence that the adjustments "reflect actual wage increases received by CHA janitorial employees, or that they correspond to any other real-world statistic." (*Id.*) Thus, Defendant submits, Plaintiff may not receive any compensation until he explains the derivation of his back pay request. (*Id.*) *See Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 606 (7th Cir.1985) (noting that a plaintiff must produce evidence establishing the amount of authorized back pay).

Plaintiff claims that, had he not been fired, he would have been earning a wage/benefit package worth approximately $37,000 per year. (Pl.'s Back Pay Petition, at 7.) In a job loss case, Plaintiff maintains, his damages are presumed to equal the lost wages and benefits as determined by multiplying his compensation package by the period he was out of work. (*Id.,* at 1–2); *Barbour v. Merrill,* 48 F.3d 1270, 1278 (D.C.Cir.1995). Plaintiff apparently considers his "Amended Calculation of Back Pay & Interest" document ample evidence of the legitimacy of his back pay request because he offers no further explanation for the $70,175.08, and later, $94,261.95 figures.[6]

■ The proper measure of back pay damages is the "difference between actual earnings for the period and *those which [the plaintiff] would have earned absent the discrimination by defendant.*" *Taylor,* 593 F.2d at 786 (emphasis supplied). Although Plaintiff does not give an in-depth assessment of his calculations, he does indicate the amount he believes he would have earned had there been no wrongful termination—$94,261.95 as of October 24, 1996. He also reduces this figure by $6,000 representing his various income offsets. (Pl.'s Back Pay

Petition, at 8.) Defendant, which presumably has superior access to information concerning the pay and benefits Plaintiff would have earned had he remained employed at CHA, has not rebutted Plaintiff's calculations. The court gives Plaintiff the benefit of the doubt and finds that his request suffices as a threshold showing of damages owed.

### 3. *Failure to Mitigate Damages*

Having determined that Plaintiff satisfied his burden of proving damages in this case, the court turns to Defendant's primary argument—namely, that Plaintiff may not receive post-judgment back pay because he failed to offset the award with interim earnings.[7] As a threshold matter, this court must decide whether a plaintiff has a continuing duty to mitigate his losses after a favorable verdict but before actual reinstatement.

#### a. Post-Verdict Versus Pre-Verdict Back Pay

Plaintiff argues that this case is unique because it involves a request for a post-judgment back pay award. Unlike employees who fail to seek employment pending the outcome of the trial, Plaintiff asserts, he had every reason to believe his reinstatement was imminent due to his favorable verdict. (Pl.'s Back Pay Petition, at 5–6.) According to Plaintiff, this case is, therefore, distinguishable from cases such as *Hunter* and *Payne,* both of which involved plaintiffs who were remiss in their employment search efforts in hope of being made whole by the judgment. (Pl.'s Back Pay Petition, at 5.) With this argument, Plaintiff wields a double-edged sword. On the one hand, he asks this court to apply traditional back pay mitigation rules in finding that Defendant has not met its burden of proof; on the other hand, he claims that his facts are distinguishable from these traditional wrongful discharge cases and seeks to be excused from the obligation to mitigate.

---

6. Plaintiff also seeks a minimum of $17,267.42 in post-judgment interest. The court addresses this issue below. *See infra* at p. 614.

7. Interim earnings are defined as "wages (or the like) earned by a discriminated upon employee in

the period after his discharge but before judgment that, but for the discrimination, would not have been earned." *Chesser v. State of Illinois,* 895 F.2d 330, 337 (7th Cir.1990).

The issue of whether a plaintiff is entitled to back pay for time after the entry of a favorable verdict has not been addressed specifically in the courts. In fact, this court located only one case which even mentioned such a remedy. In *Tennes v. Commonwealth of Mass., Dept. of Revenue*, 745 F.Supp. 1352 (N.D.Ill.1990), the plaintiff apparently sought post-judgment back pay in addition to traditional back pay, liquidated damages, reinstatement, attorneys fees and costs. *Id.* at 1354. The court granted the plaintiff's request for standard back pay but, by way of footnote, denied the request for post-judgment back pay, stating that the plaintiff did not cite authority for such an award, and that "[t]here appears to be no basis in law or equity for this request." *Id.* at 1360 n. 2. The Seventh Circuit affirmed this ruling, explaining that the award would be too speculative in that Tennes' future with the Massachusetts Department of Revenue was uncertain given the high turnover rate among the employees in his bureau. *Tennes v. Commonwealth of Mass., Dept. of Revenue*, 944 F.2d 372, 380–82 (7th Cir.1991).

The court finds these opinions instructive, although neither party cited them as authority. As in *Tennes*, Plaintiff's future with the CHA is highly tentative due to Defendant's announced efforts to reduce its workforce over the past several years. Moreover, a plaintiff may not forego all job search efforts merely because he received a favorable jury verdict. As counsel is certainly aware, verdicts are routinely appealed and the process can last several years (as unfortunately revealed in this case). *See, e.g., Lorenz v. Valley Forge Ins. Co.*, 23 F.3d 1259, 1260 (7th Cir.1994) (post-trial proceedings consumed three years); *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union, No. 7*, No. 85 C 3295, 1987 WL 20426, at *1 (N.D.Ill. Nov. 24, 1987) (appeal pending for two years). As both parties are now painfully aware, the court had great difficulty with the post-judgment motions in this case and recognizes that there is no guarantee that the jury's decision will survive an appeal. A plaintiff in a case such as this one could, therefore, waste valuable time waiting for a reinstatement that may never materialize. Plaintiff had a continuing duty to seek alternate employment pending his actual reinstatement with the CHA.

At the same time, Defendant may not delay in rehiring a wrongfully terminated employee without bearing some of the burden of its choice. In *NLRB v. Ryder Sys., Inc.*, 983 F.2d 705, 715 (6th Cir.1993) (hereinafter "*Ryder*"), for example, the Sixth Circuit recognized that the plaintiff, a truck driver, was forced to seek a lower-paying position as a painter in part because of the defendant's own dilatory tactics in refusing to rehire the plaintiff pending the appeal. 983 F.2d at 715. An Administrative Law Judge ordered Ryder to reinstate the plaintiff in August 1985, but Ryder decided to wait until it exhausted all of its appeals before complying with the order (a decision the court described as "penny-wise but pound-foolish"). *Id.* During this process, nevertheless, the plaintiff affirmatively sought (and found) some type of employment. *Id.*

█ In this court's view, a plaintiff must continue his efforts at mitigating his post-verdict but pre-reinstatement losses. Where, however, the plaintiff is genuinely unable to find work or is forced to "lower his sights" and accept an inferior position, the defendant will be responsible for the difference (however great) between what the employee would have been earning and what he actually earned during the period prior to his reinstatement.

### b. Mitigation of Damages

█ In order to succeed in showing that Plaintiff failed to mitigate his losses, Defendant must meet the two-prong *City of Chicago* test articulated above. The CHA must show that (1) Plaintiff did not exercise reasonable diligence to mitigate his losses, and (2) there was a reasonable likelihood that such diligence might[8] have resulted in com-

---

8. In his reply memorandum, Plaintiff claims that Defendant must prove a reasonable likelihood that Plaintiff *would* have found comparable work. (Pl.'s Back Pay Petition, at 2) (emphasis supplied). The court notes that the words "would" and "might" are not synonymous and

parable work. *City of Chicago,* 853 F.2d at 578; *Ford Motor,* 458 U.S. at 231, 102 S.Ct. at 3065. Plaintiff was not under a duty to accept just any job; rather, he could look for comparable jobs for which he had a reasonable likelihood of receiving an offer of employment. *Gaddy,* 884 F.2d at 318–19. *See also City of Chicago,* 853 F.2d at 578–79 (upholding plaintiff's decision to quit her job with the city Purchasing Department and look for other employment where the position was not sufficiently equivalent to that of police officer).

### 1. Reasonable Diligence

■ Determining whether a plaintiff exerted sufficient effort in locating an alternate job is one of fact, and courts do not always agree on what constitutes "reasonable diligence." In *Gaddy,* the employee contacted over one hundred employers, used two employment agencies, answered newspaper ads and followed leads from friends and relatives; however, she failed to pursue a "favorable response" to an employment inquiry at Kraft Foods. 884 F.2d at 318–19. The court held that this was sufficient for mitigation purposes, and noted that the employer presented no evidence that if Gaddy had pursued her employment opportunities at Kraft, there was a reasonable probability she would have received an offer. *Id.* at 319. *See also Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir.1994) (plaintiff adequately mitigated her damages where, over a four-year period, she registered with the State of Wisconsin job service, attended seminars, joined a networking group, took courses to upgrade her computer skills, answered newspaper advertisements, and submitted nearly 600 resumes to prospective employers).

disregards Plaintiff's version as an incorrect statement of the law. Nevertheless, as discussed below, the court concludes that Defendant has not met even the lesser burden imposed by the Seventh Circuit.

9. The following is a list detailing Plaintiff's job search efforts since the trial ended in November 1993:

 1. Application for position as baggage handler at Midway Airport—1994

Indeed, the court in *Reilly v. Cisneros,* 835 F.Supp. 96, 101 (W.D.N.Y.1993) also found that the plaintiff adequately mitigated his damages where he made only two job applications during his first year of unemployment and made minimal efforts while working as a temporary employee. *Id.* at 100–01. In finding these search efforts adequate, the court noted that the plaintiff was battling alcoholism, and that sending out resumes without knowing of actual job openings does not usually produce employment. *Id.* at 101. The court observed that it was the unavailability of jobs, rather than the inadequacy of plaintiff's search methods, that resulted in his inability to find comparable work. *Id.*

The plaintiff in *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228 (7th Cir.1986), answered want ads, registered with employment agencies, and applied for various positions, but did not pursue other known opportunities with new car dealerships. *Id.* at 1234. The Seventh Circuit found the plaintiff's efforts sufficient, although it was "not untroubled by the [low] level of Wheeler's post-termination job-seeking activities." *Id.* As the court noted, "[a] diligent ... plaintiff endeavoring to mitigate damages would at least check the want ads, register with employment agencies, and discuss job opportunities with friends and acquaintances." *Id. See also Fleming,* 898 F.2d at 561 (employee failed to exercise reasonable diligence to mitigate damages where he contacted only two headhunting firms in his first two years of unemployment, and turned down two or three job offers).

■ In this case, Plaintiff's efforts to secure alternate employment have been few and far between. From approximately 1994 to the present, he has submitted only four job applications, and merely inquired into three or four other positions.[9] (Coleman

 2. Application to Northwestern Airlines—May 1995 (rejected in June/July 1995)
 3. Application to City College—May 1996 (still pending as of July 1996)
 4. Follow-up inquiries to Kevin Cruz at CHA
 5. Avis Rent A Car—1994 (inquired but made no formal application)
 6. Budget Rent A Car—1993, 1995 (inquired but made no formal application)
 7. Attended Job Fair
 8. Employment tests at post office—1993 or 1994 (did not qualify, reason unknown)

Dep., at 17–41.) Although he did receive some work through friends and relatives, he never checked the want-ads or registered with an employment agency. (*Id.*) Defendant submitted numerous pages from the *Chicago Tribune* classified section which listed various maintenance positions.[10] (Defendant's Exhibits in Opposition to Plaintiffs Petition for Back Pay (hereinafter "Def.'s Ex." 2, C.) Plaintiff, however, failed to contact any of these employers regarding possible employment. *See Wheeler*, 794 F.2d at 1234 (stating that a reasonably diligent employee would at least check the want ads). Even if none of the listed positions was a legitimate opportunity for employment, Plaintiff still had an obligation to contact the potential employers and make some inquiries—an obligation, the court notes, that would typically entail merely picking up a telephone. A discharged employee can satisfy the obligation to mitigate damages despite an unsuccessful search "so long as [he] demonstrates an honest, good faith effort to locate comparable employment." *E.E.O.C. v. Ilona of Hungary, Inc.*, 97 F.3d 204, 216 (7th Cir.1996) (citing *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir.1992)). In this court's view, Plaintiff has not made a good faith effort to find alternate employment. Thus, CHA has met its burden on this issue.

■ Plaintiff points out that he earned some income while self-employed, and argues that he cannot be penalized merely because this effort proved fruitless. (Pl.'s Back Pay Petition, at 5.) The court recognizes that "[s]elf-employment can constitute employment for purposes of mitigating damages, *as long as* the self-employment was a *reasonable alternative* to finding other comparable

employment." *Smith*, 969 F.2d at 438 (citing *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005 (3d Cir.1988) (emphasis supplied)). Here, however, Plaintiff, a maintenance worker, has not shown that it was reasonable for him to pursue only self-employment rather than a staff position where he had no experience as an entrepreneur. In any event, there is no evidence here that Plaintiff made any serious attempts to form or market his own business. The single decades-old case Plaintiff cites in support of his argument confirms this court's opinion. In *Crabtree v. Elizabeth Arden Sales Corp.*, 105 N.Y.S.2d 40 (1951), *aff'd*, 279 A.D. 992, 112 N.Y.S.2d 494 (1952), *aff'd*, 305 N.Y. 48, 110 N.E.2d 551 (1953), the plaintiff was originally hired by the defendant as a sales manager. After his termination, he began operating his own business, an option the court found reasonable given the "nature of his prior employment and the fact that a position in the nature of that held by him was not too readily or easily obtainable." *Id.* at 45. There is no basis here to excuse Plaintiff from seeking maintenance or custodial work.

## 2. Job Comparability

■ Plaintiff claims that most of the jobs listed in Defendant's want-ads exhibit were not comparable to his position with the CHA and, therefore, Defendant has failed to make its showing on this issue. Specifically, many of the listings were for janitors or custodians, yet Plaintiff had worked in a more prominent "crew-supervising" capacity. (Pl.'s Back Pay Petition, at 6.) The court recognizes that Plaintiff had advanced to a supervisory role with the CHA, but notes that he predominantly engaged in custodial

(Coleman Dep., at 17–25, 33–35.) Between May 1994 and July 1996, Plaintiff performed various maintenance jobs, including such tasks as replacing vinyl siding, installing appliances and cabinets, and plastering and painting rooms. (*Id.* at 8–14.) He learned about most of these jobs through his church, and earned anywhere from $25 to $1,142.85 per assignment. (*Id.*) Plaintiff performed two jobs in May 1994, one in March or April 1995, one in July 1995, three in October 1995, one in December 1995, three in March 1996, three in June 1996, and two in July 1996. (*Id.*) Many presumably took only a few days to complete-for example, cutting grass and cleaning

a yard, driving a van on road trips, and rehanging a gutter most likely required minimal time.

**10.** Plaintiff challenges these advertisements as hearsay under FED.R.EVID. 802. *See, e.g., Logan v. Pena*, Civ. A. No. 91–2389–JWL, 1993 WL 62316, at *6 (D.Kan. Feb. 9, 1993) (job listings in newspapers are inadmissible hearsay where offered to prove the existence of such jobs). The court, nonetheless, considers the exhibits for the purpose of establishing that there were job listings to which Plaintiff could have responded, regardless of whether they would have resulted in employment.

and janitorial tasks. At trial, Plaintiff testified that he was first promoted to his position as maintenance supervisor (in a temporary capacity) when he performed well on a test designed to measure his qualifications to do repair work. (Tr., at 369.) Plaintiff further stated that his permanent promotion to maintenance supervisor resulted from his "knowledge of supplies, working out the time schedules, [and] my relationship with the tenants." (*Id.*) Indeed, the sporadic handyman work he performed following his discharge involved just such hands-on repair and maintenance skills. (Def.'s Ex. 2; *see supra* note 8.) Plaintiff's supervisory role notwithstanding, the court finds the positions listed in the *Tribune* to be sufficiently comparable to Plaintiff's maintenance job with the CHA. Many of the positions sought a supervisory employee; moreover, Plaintiff has been out of work for approximately four and a half years and has certainly reached the point where a reduction in expectations is required. *See Hunter*, 797 F.2d at 1428 (finding that the plaintiff's failure to find alternate employment for five years was insufficient for mitigation purposes, and noting that "[a]t some point people must put their legal troubles behind them and get on with their lives").

### 3. Likelihood of Obtaining Employment

 In addition to job comparability, Defendant must show that Plaintiff had a reasonable likelihood of actually getting the available position. *Gaddy*, 884 F.2d at 318–19. As noted, Defendant submitted numerous pages of advertisements from the *Chicago Tribune* listing job opportunities for maintenance personnel. (Def.'s Ex. 2, C.) In addition to his hearsay objection, Plaintiff contends that these want-ads do not establish either that such jobs actually existed, or that Plaintiff had a reasonable likelihood of securing one of them. (Pl.'s Back Pay Peti-

tion, at 6.) At least some case law supports this position. *See Mueller v. First Nat'l Bank of Quad Cities*, 797 F.Supp. 656, 658 (C.D.Ill.1992) (admitting defense exhibits of job listings in newspapers and magazines, but requiring proper showing that the positions were available and represented actual job openings for the plaintiff); *Ryder*, 983 F.2d at 715 (finding that the defendant's reliance on help-wanted advertisements as evidence of job availability did not establish that any employment opportunities were specifically available or rejected by the plaintiff).[11]

The court is not persuaded by Plaintiff's claims that he did not want to mislead potential employers by accepting employment with the knowledge that he may be returning to the CHA shortly thereafter. (*Id.*, at 41–42.) Nothing prevented him from accepting a job pending his actual reinstatement and, when appropriate, choosing whether he wanted to keep his new position or return to the CHA. Equally unconvincing are Plaintiff's claims that no one would hire him in light of the circumstances surrounding his discharge. He prevailed at trial, and there is no indication that the CHA intended to sabotage his search efforts. *Compare Smith*, 969 F.2d at 439 (jury could conclude plaintiff's effort to find comparable work would be fruitless because his supervisor testified he would tell prospective employers that plaintiff simply walked off the job without notice). In any event, Plaintiff did not exert sufficient effort locating a job to lend any support to this theory. *See Hunter*, 797 F.2d at 1427 (noting that plaintiff might have had difficulty securing a new job because he was fired for falsifying records, but finding that his job search efforts were "not sufficiently assiduous to test this hypothesis").

This court is reluctant to reward Plaintiff's lack of industry. Nevertheless, the two-

---

11. Other courts, however, do recognize such advertisements as evidence of job availability. In *Smith v. Enesco Imports Corp.*, No. 87 C 4975, 1989 WL 103362, at *6 (N.D.Ill. Aug. 28, 1989), for example, the defendant attempted to establish job opportunities by having a witness testify as to employment listings in newspapers and journals. *Id.* at *6. The court in that case concluded that even where a defendant introduces evidence of job openings the plaintiff failed to pursue, this does not bar recovery if the plaintiff instead pursued some other equally reasonable option. *Id.* (citing *Marshall v. Arlene Knitwear, Inc.*, 454 F.Supp. 715 (E.D.N.Y.1978).) *See also Hunter v. Allis Chalmers Engine Div. Corp.*, No. 79 C 1074, 1985 WL 2097, at *1 (N.D.Ill. July 30, 1985) (newspapers used to establish job availability).

pronged test set forth in the case law requires Defendant to make a showing that further efforts on Plaintiff's part might have succeeded. All that Defendant has offered to meet this burden are copies of want-ads. No case law cited by Defendant nor located by this court establishes that such a showing, without more, is adequate to meet Defendant's burden. Nowhere does the court find evidence of the specific job qualifications sought by the potential employers and how they compare to Plaintiff's skills and background. Nor did Defendant present evidence from any potential employer that an application from Plaintiff would have resulted in an offer. Thus, although Plaintiff was undoubtedly remiss in his efforts to mitigate his damages, Defendant has failed to adequately demonstrate that Plaintiff had a reasonable likelihood of receiving a job offer had he contacted the employers in the newspaper. Although Plaintiff appears to believe that he was qualified to do "anything I want to" in the maintenance field (Coleman Dep., at 41), Defendant presented no evidence that potential employers shared that assessment. The court accordingly awards Plaintiff $88,261.95 in post-judgment back pay—$94,261.95 in lost wages and benefits minus $6,000 in income offsets.

### C. *Post-Judgment Interest*

 In addition to the supplemental back pay, Plaintiff also seeks post-judgment interest on the $155,000 jury award—an amount equaling at least $17,267.42. Under § 1961(a) of Chapter 28 of the U.S.Code, post-judgment interest is awarded automatically to civil litigants recovering money judgments in federal court. *Student Loan Marketing Ass'n v. Lipman,* 45 F.3d 173, 176 (7th Cir.1995); *Partington v. Broyhill Furniture Indus., Inc.,* 999 F.2d 269, 274 (7th Cir.1993); 28 U.S.C. § 1961(a).[12] The interest runs from the date of entry of the judgment in favor of the plaintiff. *Graefenhain,* 870 F.2d at 1211; *Ohio–Sealy Mattress Mfg.*

---

12. Section 1961 provides:
 Interest shall be allowed on any money judgment in a civil case recovered in a district court ... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent

*Co. v. Sealy, Inc.,* 585 F.2d 821, 845 (7th Cir.1978). The court agrees that Plaintiff is entitled to post-judgment interest as provided by statute; indeed, Defendant does not specifically challenge this request.

### CONCLUSION

Both parties in this case have failed to exercise sound judgment and due diligence. Defendant stubbornly refused to grant Plaintiff a conditional return to employment pending appeal; Plaintiff unjustifiably refrained from pursuing reasonable employment opportunities. The court nonetheless awards Plaintiff $88,261.95 in back pay for the period extending from the date of the verdict to the date of this decision in light of Defendant's failure to provide sufficient evidence that, had Plaintiff made appropriate efforts, he might have actually received job offers. Judgment will be entered in that amount, plus the $155,000 awarded by the jury. Post-judgment interest accrues automatically by statute.

... of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.
28 U.S.C. § 1961(a).