87 P.3d 607 (2004)
2004 OK 17
Bruce R. COX, Petitioner/Appellee,
v.
STATE of Oklahoma, ex rel., OKLAHOMA DEPARTMENT OF HUMAN SERVICES, Respondent/Appellant, and
Oklahoma Merit Protection Commission, Respondent.
No. 96,899.
Supreme Court of Oklahoma.
March 9, 2004.
*609 Charles L. Waters, General Counsel, Richard A. Resetaritz, Assistant General Counsel, Oklahoma Department of Human Services, Oklahoma City, OK, for Respondent/Appellant.
Robert W. Cole, Oklahoma City, OK, for Petitioner/Appellee.
KAUGER, J.:
¶ 1 We granted certiorari to determine whether: 1) in all instances, 74 O.S.2001 § 840-6.3[1] or Merit Protection Commission Rule OAC 455:10-11-4[2] require an employer *610 to progressively discipline an employee before discharge or to demonstrate that some lesser disciplinary act would be ineffective before imposing a more stringent penalty; and 2) the factual determination to uphold the employee's discharge was clearly erroneous in view of the reliable, material, probative and substantially competent evidence or arbitrary or capricious.[3] We determine that 74 O.S.2001 § 840-6.3 and Merit Protection Commission Rule OAC 455:10-11-4 do not mandate the institution of progressive discipline before discharge in all causes nor do they require employers to prove that some less severe disciplinary act would be ineffective before imposing a more stringent penalty. Furthermore, although the record contains conflicting evidence on the issues of sexual harassment and retaliation, the factual determination to uphold the employee's discharge was neither clearly erroneous in view of the reliable, material, probative and substantially competent evidence nor was it arbitrary or capricious. Therefore, this Court will not substitute its judgment for that of the agency on its factual determinations.[4]

CONTESTED FACTS
¶ 2 On December 3, 1974, the petitioner/appellee, Bruce R. Cox (Cox), went to work as a permanent classified employee for the respondent/appellant, Oklahoma Department of Human Services (DHS/employer). In May of 1999, while Cox occupied the position of County Director, the Office for Civil Rights received a complaint indicating that he had engaged in sexual harassment and created a hostile work environment. Cox's supervisor filed the complaint based upon the allegations of Glenda Trekell (Trekell/complainant). Trekell asserted that Cox made unwelcome sexual remarks, repeatedly told dirty jokes, traded "favors for favors", and engaged in physical contact with other female employees. Representatives of the Office of Civil Rights: interviewed staff from Cimarron, Beaver, Texas, Woodward and Alfalfa Counties; reviewed electronic mail sent to and received from Cox; and perused personnel files to determine whether Cox had promoted an employee from Secretary I to Social Worker Assistant without her having met the requirements for the position.
¶ 3 When interviewed, Cox did not deny making sexual remarks. Rather, he indicated that he had made such remarks "to half the state". Documentation did not indicate that the secretary met the requirements for a promotion to a social worker position. Although not directly supervised by Cox, the Office of Civil Rights determined that one female employee had taken a voluntary demotion to avoid the hostile work environment Cox created. Furthermore, it uncovered evidence demonstrating Cox's use of DHS's electronic mail system to conduct personal romances and to send sexually oriented jokes demeaning to women. It determined that Cox violated DHS policy relating to: the *611 courteous treatment of clients and employees; conduct unbecoming a public employee; and willful violation of the Oklahoma Personnel Act, 74 O.S.2001 § 840-1.1 et seq. His actions were also found to violate Title VII of the Civil Rights Act of 1964 and administrative prohibitions against the misuse of position and policy. The Office of Civil Rights recommended that Cox be disciplined and that the voluntarily demoted worker be reinstated to her prior position with pay.
¶ 4 On January 4, 2000, Cox's supervisor wrote Cox indicating that he was being given notice of a proposed adverse actiondischarge. A revised letter was forwarded on January 11, 2000. On the same dates, under separate cover, Cox was provided documents relating to the termination decision. Although Cox contends that he was never advised that the investigative materials were confidential, both these transmittals provide that the investigative summary was a confidential document maintained separately from the employee's local personnel file. Furthermore, the investigators with the Office of Civil Rights and Cox's supervisor assert that they discussed with Cox, in-depth, his responsibility in regard to confidentiality and retaliation.
¶ 5 Following receipt of the termination notice, Cox called a meeting of all staff on January 12, 2000, having employees sign a sheet indicating the meeting was called for sexual harassment training. Following this meeting, an employee called Cox's supervisor. Because Cox stated that he would make the confidential investigative materials available to anyone who cared to read them, she was upset and feared reprisal. According to the employee, Cox even went so far as to say he would publish the report on the internet. The employee alleged that Cox called those who made statements against him liars and pressured other employees to write letters in his support. He also allegedly encouraged male employees to file complaints against female staff members who were not "lily white". On January 20, 2000, the Office of Civil Rights received a telephone call from an employee in Texas County who had read the confidential investigative report and was upset because she believed that the relationship between herself and Cox had been mischaracterized and she had been slandered.
¶ 6 As a result of these contacts, the Office of Civil Rights launched a second investigation. On January 21, 2000, it requested that Cox be removed from duty pending completion of the investigation concerning alleged retaliation. The Office of Civil Rights determined that the allegations relating to the coercive nature of the January 12th meeting were well founded, that a hostile work environment was created, and recommended that disciplinary action be imposed. On January 31, 2000, Cox was forwarded an amended notice of proposed adverse action calling for his discharge and setting a pre-termination hearing for February 15th. The administrative hearing officer's report of the pre-termination hearing provides that testimony elicited at the hearing was contradictory. Nevertheless, she deemed the evidence sufficient to support the sexual harassment and hostile work environment charges warranting discharge.
¶ 7 Cox was issued a final notice of formal disciplinary actiondischargeon March 6, 2000. He filed a petition for reconsideration with the respondent, Oklahoma Merit Protection Commission (Merit Protection Commission). The testimony at the hearing on August 22, 2000, like that at the pre-termination hearing, was sharply divided between that detrimental to his cause and that in his favor. The original complainant testified that on two different occasions, Cox had asked her if she knew what "kinky sex was". Both times, he told her that it was "sex with a fat woman, `cause there's so many kinks to put it in." The complainant also stated that Cox asked her at a training conference mixer if she'd ever needed "to go pee real bad". When she responded affirmatively, he asked her to "feel of me and see if I need to go".[5] The same evening, Cox allegedly invited his secretary to spend the night with him in front of a group of people because she had seen a mouse in her room earlier in the day.[6]
*612 ¶ 8 Another social worker testified that when a young, attractive female came into Cox's office to apply for food stamps, he would make comments indicating that, based on her looks, she could qualify for assistance.[7] The social worker also described an incident following the hiring of a new secretary in which Cox referred to a stripper who painted her breasts to look like puppies to some other employees. When the new secretary came into the room where the discussion was ongoing, Cox allegedly asked her if she would "show him her puppies". She responded that she would, if she had any. Only after Cox had returned to his office and the secretary was told of the basis of the discussion did she recognize she had been made the brunt of a joke involving her anatomy.[8] The social worker indicated that Cox's sexual comments and innuendos were so prevalent that she kept her son and her mother-in-law out of Cox's office because she didn't want either of them exposed to his remarks.[9] She also confirmed that Cox called a meeting in which he threatened to release the investigative report on the internet or to anyone in the office that wanted to read it. He also stated that the report contained false information.[10] Because of these comments and the release of the report, the social worker was berated by others in the office and ostracized.
¶ 9 Another thirty-year DHS employee testified that Cox would often comment on attractive women coming into the office saying that he would like to take them home with him or "have" them.[11] She also stated that Cox referred to potential hirelings as needing to pass the "elbow test"an exercise in which the female might be asked to walk up to a wall with her elbows extended to determine whether her elbows or her breasts would contact the wallbefore being hired.[12] This long-term employee transferred to a different job, taking a pay cut, to avoid the sexually charged atmosphere in Cox's office and the favoritism he evidenced.[13]
¶ 10 The investigator for the Office of Civil Rights testified that Cox admitted to telling many of the sexual jokes described.[14] An examination of Cox's computer uncovered a stored sexually explicit image of an exposed penis urinating into a beer stein.[15] There were also electronic mail messages to a subordinate female employee asking her to take a ride with him, drink beer and talk nasty. To his secretary, he wrote that he had injured himself and asked that if she was going to "kiss it and make it better", could he change the location of the injury to his mouth. He also wrote her inquiring whether she would want a church wedding or to just elope.[16] Another electronic mail message to the secretary asked her if she knew how to impress a man. Cox informed her that to do so one should "show up naked and bring beer". There were other communications between Cox and a former DHS employee in which he called her "darling", told her he loved her and that the only reason he didn't call was because he was afraid her husband would answer the telephone.[17]
¶ 11 Following the meeting called by Cox concerning the investigation, the investigator *613 received approximately five calls from employees who said, because of the information that Cox revealed, they had been accosted by other employees, humiliated, embarrassed and intimidated.[18] The investigator testified that in another situation, very similar to the one presented by the allegations against Cox, the DHS employee was terminated for creating a hostile work environment and sexual harassment.[19] Additionally, the investigator stated that, in his opinion, termination was the appropriate result and that he did not believe that Cox would change his behavior even if a lesser form of discipline were imposed.[20]
¶ 12 Cox's supervisor stated that once she reviewed the evidence from the investigation she became convinced that termination was justified rather than some lesser discipline. She based the decision not only on the original complaints involving sexual harassment but also on his decision to call a meeting and to intimidate employees once he was notified that he might lose his job. The supervisor simply felt there was no justification for not terminating him.[21] She also testified that she told Cox three times, with emphasis, that the investigative report was confidential.[22]
¶ 13 In rebuttal, Cox testified that the meeting which was held on January 12th had been previously scheduled as family support training and that, after he received the investigative report, he asked his secretary to gather everyone who was there. He denied having a sexually inappropriate relationship with an employee and stated that the only time he referred to the "elbow test" was when he was talking about a former supervisor who had used the test as a hiring procedure. He did admit to telling the jokes related to "kinky sex" and employing the "pee test" at parties or around the table at dinner as an ice breaker. He denied asking an employee to touch him to see if he needed to urinate. Cox testified that he had not asked his secretary to stay with him because she had seen a mouse in her room and that the incident concerning the new secretary and the "puppy conversation" occurred because other female employees shared a picture of a stripper with him. According to Cox, the new secretary walked in on the conversation, heard the term "puppies" and said she had some puppies and asked if anyone wanted to see them. When questioned about his electronic mail, Cox stated that he didn't believe any communications to be inappropriate.
¶ 14 Cox testified that during the meeting called on January 12th, he explained the complaint against him. He stated that he was never told the report was confidential and that he did not harass or intimidate anyone, nor did he encourage his male associates to file frivolous claims. He also indicated, that given the chance, he would change his behavior.
¶ 15 Four DHS employees testified that Cox did not tell sexually explicit jokes in the office and that they had never heard him refer to the "elbow test" or tell a joke about "kinky sex". Other witnesses said that Cox might tell a joke of a sexual nature on occasion[23] and he had mentioned the "elbow test".[24] None of these employees felt that there was any sexual harassment going on in the office or that the meeting held concerning the investigative report created a hostile work environment. Nevertheless, three of these employees indicated that the investigative report had been made available to them[25] and another individual testified that *614 she was aware that several employees saw the report.[26]
¶ 16 The administrative hearing officer issued a final order on September 13, 2000, finding that: 1) progressive discipline need not always be imposed; 2) a preponderance of the evidence supported Cox's discharge; and 3) there had been no abuse of discretion under the facts and circumstances of the cause. The Commissioners en banc reviewed the hearing officer's ruling on October 30, 2000, denying Cox's request for rehearing or reconsideration of the order. On November 27th, Cox filed a petition for review with the district court.[27] After hearing argument, the trial judge, Honorable Ryan D. Reddick, issued an order on July 30, 2001, leaving undisturbed the administrative hearing officer's findings of fact and determining that the employer failed to follow statutory mandates for progressive discipline, reversing the administrative decision and ordering the employee be reinstated. The employer appealed and the Court of Civil Appeals affirmed, subsequently denying DHS's petition for rehearing on August 8, 2003. On November 3, 2003, certiorari was granted.

I.
¶ 17 TITLE 74 O.S.2001 § 840-6.3 AND MERIT PROTECTION COMMISSION RULE OAC 455:10-11-4 DO NOT MANDATE THE IMPOSITION OF PROGRESSIVE DISCIPLINE IN ALL INSTANCES NOR DO THEY REQUIRE EMPLOYERS TO AFFIRMATIVELY DEMONSTRATE THAT SOME LESSER DISCIPLINARY ACT WOULD BE INEFFECTIVE BEFORE IMPOSING A MORE STRINGENT PENALTY.
¶ 18 DHS contends that neither 74 O.S.2001 § 840-6.3[28] nor Merit Protection Commission Rule OAC 455:10-11-4[29] mandate the imposition of progressive discipline in all causes. Cox does not dispute seriously this premise. Rather, he argues that public policy mandates that only when an agency demonstrates that no lesser alternative punishment would properly address the problem may an employee be discharged without being given the opportunity to correct behavior through the progressive disciplinary process. DHS asserts that neither the statute nor the rule impose such a burden on the employer.[30] We agree.
¶ 19 In determining whether a statute applies to a given set of facts, we focus on legislative intent[31] which controls statutory interpretation.[32] Intent is ascertained from *615 the whole act in light of its general purpose and objective[33] considering relevant provisions together to give full force and effect to each.[34] The Court presumes that the Legislature expressed its intent and that it intended what it expressed.[35] Statutes are interpreted to attain that purpose and end[36] championing the broad public policy purposes underlying them.[37] Only where the legislative intent cannot be ascertained from the statutory language, i.e. in cases of ambiguity or conflict, are rules of statutory construction employed.[38]
¶ 20 Title 74 O.S.2001 § 840-6.3 provides in pertinent part:
"A. Each appointing authority shall establish written policies and procedures for progressive discipline of employees according to the rules established by the Oklahoma Merit Protection Commission....
B. Progressive discipline is a system designed to ensure not only the consistency, impartiality and predictability of discipline, but also the flexibility to vary penalties if justified by aggravating or mitigating conditions. Typically, penalties range from verbal warning to discharge, with intermediate levels of a written warning, suspension or demotion....
C. Each supervisor shall be responsible for applying discipline when necessary that is progressive in nature, appropriate for the offense, and equitable. Each supervisor shall consider aggravating or mitigating circumstances when determining the proper disciplinary action. Each supervisor shall use prompt, positive action to avoid more serious disciplinary actions. The Oklahoma Merit Protection Commission shall promulgate rules to establish the requirements and guidelines for discipline." [Emphasis provided.]
¶ 21 Cox finds support for his premise in the apparently mandatory language of the statute providing that: a progressive disciplinary process "shall" be established; supervisors "shall" be responsible for applying discipline progressively; and the requirement that supervisors "shall" move promptly to avoid more serious disciplinary actions. Although the use of "shall" generally signifies a legislative command,[39] the term can be permissive.[40] Furthermore, despite the Legislature's clear intent that progressive discipline should be the norm when employers deal with underperforming employees, the statute also provides that, within the system itself, flexibility exists to vary penalties when justified by aggravating or mitigating circumstances. Nevertheless, the statute does not impose a duty on the employer or agency to demonstrate that a lesser disciplinary action would be ineffective before any higher penalty is instituted.
¶ 22 The Legislature may delegate rule making authority to agencies, boards and commissions to facilitate the administration of legislative policy pursuant to the Administrative Procedures Act, 75 O.S.1991 *616 § 250 et seq.[41] Administrative rules are valid expressions of lawmaking powers having the force and effect of law.[42] Administrative rules, like statutes, are given a sensible construction bearing in mind the evils intended to be avoided.[43] Statutory construction by agencies charged with the law's enforcement is given persuasive effect especially when made shortly after the statute's enactment.[44] The Legislature has directed the Merit Protection Commission to promulgate rules to establish the requirements and guidelines for progressive discipline.[45] In connection with its responsibility to provide such guidelines, the Merit Protection Commission promulgated OAC 455:10-11-4[46] providing in pertinent part:
"... Based on relevant circumstances, a single incident may justify a higher step of discipline without proceeding through lower steps of discipline." [Emphasis supplied.]
¶ 23 Taken together, the language of 74 O.S.2001 § 840-6.3, giving agencies the flexibility to vary penalties if justified by aggravating or mitigating conditions, and the text of the Merit Protection Commission's rule, providing that one incident may justify a higher step of discipline without proceeding through lower steps, make it clear that progressive steps need not always be imposed when disciplining an errant employee.
¶ 24 The Legislature has acquiesced in the Merit Commission Board's interpretation. Under the Administrative Procedures Act, the Legislature may: 1) approve, delay, suspend, veto or amend any rule or proposed rule under review by joint resolution;[47] 2) disapprove a permanent or emergency rule at any time if it determines the rule to be inconsistent with legislative intent;[48] or 3) make an emergency rule ineffective through its disapproval.[49] Once administrative rules are promulgated and successive legislative sessions are convened with no action to reject a rule, the Legislature's silence is regarded as proof of the lawmakers' consent.[50] The Legislature is deemed to have adopted an administrative construction when it amends or re-enacts a relevant statute without overriding the administratively-imposed construction.[51]
¶ 25 Through the promulgation of OAC 455:10-11-4, the Merit Commission made it clear that there may be instances in which progressive disciplinary steps are not warranted. The Legislature amended 74 O.S. 2001 § 840-6.3 effective March 31, 2003. In doing so, it did not alter the construction placed on the statute by the agency rule. Therefore, it has adopted the Merit Commission's interpretation.
¶ 26 Neither 74 O.S.2001 § 840-6.3 nor Merit Protection Commission Rule OAC 455:10-11-4 impose a duty on the employer or agency to demonstrate that a lesser disciplinary action would be ineffective before any *617 higher penalty is instituted. This Court does not read exceptions into a statute[52] nor may we impose requirements not mandated by the Legislature.[53] Therefore, we hold that 74 O.S.2001 § 840-6.3 and Oklahoma Merit Protection Rule 455:10-11-4 do not mandate the imposition of progressive discipline in all instances. Furthermore, they do not require employers to affirmatively demonstrate that some lesser disciplinary act would be ineffective before imposing a more stringent penalty.[54]
*618 II.
¶ 27 ALTHOUGH CONFLICTING EVIDENCE WAS PRESENTED ON THE ISSUES OF SEXUAL HARASSMENT AND RETALIATION, THE FACTUAL DETERMINATION TO UPHOLD THE EMPLOYEE'S DISCHARGE WAS NEITHER CLEARLY ERRONEOUS IN VIEW OF THE RELIABLE, MATERIAL, PROBATIVE AND SUBSTANTIALLY COMPETENT EVIDENCE NOR WAS IT ARBITRARY OR CAPRICIOUS; THEREFORE, WE MAY NOT SUBSTITUTE OUR JUDGMENT FOR THAT OF THE AGENCY'S FACTUAL DETERMINATIONS.
¶ 28 DHS argues that the record evidence is sufficient to support the Merit Protection Commission's final order upholding Cox's discharge. Cox contends that the evidence does not support a finding of sexual harassment or the creation of a hostile work environment and that discharge was too severe a penalty to impose.[55]
¶ 29 In reviewing an administrative order our province is not to determine whether, in the first instance, this Court would reach the same result as the administrative agency. We do not substitute our judgment for that of the agency on its factual determinations. Rather, we review the record to determine whether the petitioner's substantial rights have been prejudiced by a clearly erroneous decision considering the reliable, material, probative and substantially competent evidence resulting in an arbitrary or capricious result.[56]
¶ 30 Although there was evidence presented at the administrative hearing which would support a finding both that Cox engaged in sexually harassing behavior and created a hostile work environment through his retaliatory actions during the staff meeting held on January 12, 2000, there was also evidence from several of Cox's subordinates indicating that he did not engage in sexually explicit behavior or create a stressful environment in the work place. Nevertheless, the record contains multiple electronic mail messages from Cox to female employees which are rife with sexual innuendo. Cox testified at the hearing that he did not find these messages to be inappropriate.[57] Furthermore, following the January staff meeting, the Office of Civil Rights received a number of calls from individuals who were concerned that they would face retaliation because of the manner in which Cox handled the confidential investigatory report. One of the calls came from an employee who felt she had been slandered because of information contained in the report indicating she and Cox engaged in an inappropriate relationship.[58] Finally, the record indicates that at least one other DHS employee, engaging in similar behavior, was terminated[59] and that the investigators specifically believed that no lesser form of penalty would result in reformation of Cox's behavior.[60]
*619 ¶ 31 Under the record presented, we hold that although conflicting evidence was presented on the issues of sexual harassment and retaliation, the factual determination to uphold the employee's discharge was neither clearly erroneous in view of the reliable, material, probative and substantially competent evidence nor was it arbitrary or capricious. Therefore, we may not substitute our judgment for that of the agency's factual determinations.

CONCLUSIONS
¶ 32 We recognize that Cox's discharge seems a high price to pay for a supervisor nearing retirement. Nevertheless, a balance must be struck between the rights of the employee and the need to have governmental operations run smoothly. The Legislature has established a clear policy against sexual harassment in state agencies.[61] Furthermore, it recently added a new subsection to the progressive discipline regime indicating that evidence over four years old shall not be considered in imposing an increased penalty to a formerly disciplined employee [much of the evidence introduced in relation to Cox was contemporaneous with the charges and, at the oldest, two years preceding the disciplinary action]. However, one of the specific exemptions from the stale evidence rule is any incident involving sexual misconduct and/or harassment.[62] Here, in performing his duties, the employee violated standards, restraints and restrictions on conduct, clearly and explicitly prohibited by the Legislature. Certainly, as a general rule, employers should utilize progressive disciplinary standards to correct inadequate job performance whenever appropriate. Nevertheless, under these circumstances, requiring an employer to retain such an employee would contravene the legislatively created policy against sexual harassmentespecially where 74 O.S.2001 § 840-6.3[63] and Merit Protection Commission Rule OAC 455:10-11-4[64] do not mandate the imposition of progressive discipline in all instances or require employers to prove that some less severe disciplinary act would be ineffective before imposing a more stringent penalty.
¶ 33 The record contains conflicting evidence on the issues of sexual harassment and retaliation. Nevertheless, the factual determination to uphold the employee's discharge was neither clearly erroneous in view of the reliable, material, probative and substantially competent evidence nor was it arbitrary or capricious. Therefore, we may not substitute our judgment for that of the agency's factual determinations.[65]
CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT AFFIRMED IN PART AND REVERSED IN PART.
WATT, C.J., HODGES, HARGRAVE, WINCHESTER, EDMONDSON, JJ., concur.
BOUDREAU, J., concurs in result.
OPALA, V.C.J., and LAVENDER, J. concur in part and dissent in part.
OPALA, V.C.J., with whom LAVENDER, J., joins, dissenting in part.
¶ 1 I would affirm the trial court's judgment.
NOTES
[1] Title 74 O.S.2001 § 840-6.3 provides:

"A. Each appointing authority shall establish written policies and procedures for progressive discipline of employees according to the rules established by the Oklahoma Merit Protection Commission. Sections 530:XX-XX-XXX and XX-XX-XXX of the Oklahoma Administrative Code promulgated by the Administrator of the Office of Personnel Management are hereby transferred to the Oklahoma Merit Protection Commission and shall remain in effect until duly amended by the Commission.
B. Progressive discipline is a system designed to ensure not only the consistency, impartiality and predictability of discipline, but also the flexibility to vary penalties if justified by aggravating or mitigating conditions. Typically, penalties range from verbal warning to discharge, with intermediate levels of a written warning, suspension or demotion. Absent mitigating circumstances, repetition of an offense is accompanied by a generally automatic progression to the next higher level of discipline.
C. Each supervisor shall be responsible for applying discipline when necessary that is progressive in nature, appropriate for the offense, and equitable. Each supervisor shall consider aggravating or mitigating circumstances when determining the proper disciplinary action. Each supervisor shall use prompt, positive action to avoid more serious disciplinary actions. The Oklahoma Merit Protection Commission shall promulgate rules to establish the requirements and guidelines for discipline."
Section 840-6.3 was amended effective March 31, 2003. The amendment deleted the last sentence of subsection (A) referring to the transfer of the Administrative Code sections from the Office of Personnel Management to the Merit Protection Commission and added subsection (D) providing:
"D. The rules shall prohibit supervisors from considering incidents that occurred longer than four (4) years prior to an offense in order to move to a higher level of discipline. The prohibition shall not apply to incidents involving the following types of conduct:
1. Criminal activity;
2. Sexual misconduct and/or harassment;
3. Racially discriminatory behavior and/or harassment;
4. Threats or acts of violence against employees in the workplace; and
5. Drug and/or alcohol use or abuse on the job."
[2] Merit Protection Commission Rule OAC 455:10-11-4 provides:

"(a) Progressive discipline is a system designed to ensure not only the consistency, impartiality and predictability of discipline, but also the flexibility to vary penalties if justified by aggravating or mitigating conditions. Typically, penalties range from verbal warning to discharge, with intermediate levels of a written warning, suspension or demotion. Absent mitigating circumstances, repetition of an offense is accompanied by a generally automatic progression to the next higher level of discipline.
(b) Based on relevant circumstances, a single incident may justify a higher step of discipline without proceeding through lower steps of discipline."
[3] Title 75 O.S.2001 § 322 provides:

"(1) In any proceeding for the review of an agency order, the Supreme Court or the district or superior court, as the case may be, in the exercise of proper judicial discretion or authority, may set aside or modify the order, or reverse it and remand it to the agency for further proceedings, if it determines that the substantial rights of the appellant or petitioner for review have been prejudiced because the agency findings, inferences, conclusions or decisions, are:
(a) in violation of constitutional provisions; or
(b) in excess of the statutory authority or jurisdiction of the agency; or
(c) made upon unlawful procedure; or
(d) affected by other error of law; or
(e) clearly erroneous in view of the reliable, material, probative and substantial competent evidence, as defined in Section 10 of this act, including matters properly noticed by the agency upon examination and consideration of the entire record as submitted; but without otherwise substituting its judgment as to the weight of the evidence for that of the agency on question of fact; or
(f) arbitrary or capricious ...
(3) The reviewing court shall affirm the order and decision of the agency, if it is found to be valid and the proceedings are free from prejudicial error to the appellant."
[4] Title 75 O.S.2001 § 322, see note 3, supra; Triangle Fraternity v. City of Norman ex rel. Norman Bd. of Adjustment, 2002 OK 80, ¶ 11, 63 P.3d 1; Banks v. City of Bethany, 1975 OK 128, ¶ 6, 541 P.2d 178; Bailey v. Uhls, 1972 OK 147, ¶ 13, 503 P.2d 877.
[5] Transcript of hearing on petition for reconsideration, August 22, 2000, pp. 12-13.
[6] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 15.
[7] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 22.
[8] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 23.
[9] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 24.
[10] Transcript of hearing on petition for reconsideration, August 22, 2000, pp. 26-27 and pp. 41-42.
[11] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 39.
[12] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 39.
[13] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 40.
[14] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 55.
[15] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 58.
[16] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 59.
[17] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 60.
[18] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 63.
[19] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 65.
[20] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 66.
[21] Transcript of hearing on petition for reconsideration, August 22, 2000, pp. 73-75.
[22] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 79.
[23] Transcript of hearing on petition for reconsideration, August 22, 2000, pp. 117 and 121.
[24] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 118.
[25] Transcript of hearing on petition for reconsideration, August 22, 2000, pp. 111, 115 and 123.
[26] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 131.
[27] Title 75 O.S.2001 § 318.
[28] Title 74 O.S.2001 § 840-6.3, see note 1, supra.
[29] Merit Protection Commission Rule OAC 455:10-11-4, see note 2, supra.
[30] Anderson v. City of Lawton, 1987 OK CIV APP 91, 748 P.2d 53, an opinion released for publication by the Court of Civil Appeals, holds that the failure of the city to follow its termination and disciplinary procedures mandated reversal of a former police officer's discharge, that the discharge was not channeled through the city manager's office, as required by city ordinance, nor did the city follow its progressive discipline procedures anticipated by ordinance and a collective bargaining agreement. The opinion is non-precedential [Rule 1.200, Supreme Court Rules, 12 O.S.2001, Ch. 15, App. 1] and is distinguishable on the facts. In Anderson, the police officer was not afforded procedural guarantees and was disciplined for off-duty behavior. Here, there are no allegations that the termination decision did not proceed through the correct channels. Furthermore, although Cox asserted that he did not tell off-color jokes in the office, he did utilize the department electronic mail to forward such jokes. Neither are we bound by an unpublished opinion of the 10th Cir. In Adams v. City of Oklahoma City, 1998 WL 381062 (10th Cir. 1998), the federal court determined that, where there are options for other actions, you need not follow progressive disciplinary policy.
[31] Nealis v. Baird, 1999 OK 98, ¶ 55, 996 P.2d 438; Cooper v. State ex rel. Dept. of Public Safety, 1996 OK 49, ¶ 10, 917 P.2d 466.
[32] Smicklas v. Spitz, 1992 OK 145, ¶ 8, 846 P.2d 362; Clifton v. Clifton, 1990 OK 88, ¶ 7, 801 P.2d 693; Fuller v. Odom, 1987 OK 64, ¶ 4, 741 P.2d 449.
[33] McSorley v. Hertz Corp., 1994 OK 120, ¶ 6, 1992 OK 61, ¶ 8, 832 P.2d 834; Smicklas v. Spitz, 885 P.2d 1343; Oglesby v. Liberty Mut. Ins. Co., see note 32, supra.
[34] Haney v. State, 1993 OK 41, ¶ 5, 850 P.2d 1087; Public Serv. Co. of Oklahoma v. State ex rel. Corp. Comm'n, 1992 OK 153, ¶ 8, 842 P.2d 750.
[35] Minie v. Hudson, 1997 OK 26, ¶ 7, 934 P.2d 1082; Fuller v. Odom, see note 32, supra; Darnell v. Chrysler Corp., 1984 OK 57, ¶ 5, 687 P.2d 132.
[36] Oklahoma Ass'n for Equitable Taxation v. City of Oklahoma City, 1995 OK 62, ¶ 5, 901 P.2d 800, cert. denied, 516 U.S. 1029, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995); Wilson v. State of Oklahoma ex rel. Oklahoma Tax Comm'n, 1979 OK 62, ¶ 5, 594 P.2d 1210; Affiliated Mgt. Corp. v. Oklahoma Tax Comm'n, 1977 OK 183, 570 P.2d 335.
[37] Haggard v. Haggard, 1998 OK 124, ¶ 1, 975 P.2d 439; Price v. Southwestern Bell Tel. Co., 1991 OK 50, ¶ 7, 812 P.2d 1355.
[38] State ex rel. Dept. of Human Serv. v. Colclazier, 1997 OK 134, ¶ 9, 950 P.2d 824; Matter of Estate of Flowers, 1993 OK 19, ¶ 11, 848 P.2d 1146.
[39] United States through Farmers Home Admin. v. Hobbs, 1996 OK 77, ¶ 7, 921 P.2d 338; State ex rel. Macy v. Freeman, 1991 OK 59, ¶ 8, 814 P.2d 147; Forest Oil Corp. v. Corp. Comm'n, 1990 OK 58, ¶ 26, 807 P.2d 774.
[40] Minie v. Hudson, see note 35, supra; Texaco, Inc. v. City of Oklahoma City, 1980 OK 169, ¶ 9, 619 P.2d 869.
[41] Title 75 O.S.2001 § 250.2.
[42] Title 75 O.S.2001 § 308.2; Indiana Nat'l Bank v. State ex rel. Dept. of Human Serv., 1993 OK 101, ¶ 13, 857 P.2d 53.
[43] Oklahoma Alcoholic Beverage Control Bd. v. Burris, 1980 OK 58, ¶ 13, 626 P.2d 1316, 20 A.L.R.4th 593.
[44] Schulte Oil Co., Inc. v. Oklahoma Tax Comm'n, 1994 OK 103, ¶ 4, 882 P.2d 65. The language found in 74 O.S.2001 § 840-6.3 first appeared in legislation promulgated in 1994. The administrative rule followed the next year.
[45] Title 74 O.S.2001 § 840-6.3, see note 1, supra.
[46] Merit Protection Commission Rule OAC 455:10-11-4, see note 2, supra.
[47] Title 75 O.S.2001 § 250.2(B)(4).
[48] Title 75 O.S.2001 § 250.2(B)(6).
[49] Title 75 O.S.2001 § 253(H).
[50] Walker v. Group Health Serv., Inc., 2001 OK 2, ¶ 32, 37 P.3d 749; Peterson v. Oklahoma Tax Comm'n, 1964 OK 78, ¶ 16, 395 P.2d 388.
[51] Branch Trucking Co. v. State ex rel. Oklahoma Tax Comm'n, 1990 OK 41, ¶ 6, 801 P.2d 686; Oral Roberts Univ. v. Oklahoma Tax Comm'n, 1985 OK 97, ¶ 17, 714 P.2d 1013.
[52] World Pub. Co., v. Miller, 2001 OK 49, ¶ 10, 32 P.3d 829; Case-Aimola Properties, Inc. v. Thurman, 1988 OK 30, ¶ 9, 752 P.2d 1120; Grand River Dam Auth. v. State, 1982 OK 60, ¶ 25, 645 P.2d 1011.
[53] B.E. & K. Constr. v. Abbott, 2002 OK 75, ¶ 17, 59 P.3d 38.
[54] Our determination is consistent with the majority of jurisdictions considering the issue of whether progressive disciplinary steps must always be followed. See, Bruce Hardwood Floors, Div. of Triangle Pacific Corp. v. UBC, Southern Council of Indus. Workers, Local Union No. 2713, 103 F.3d 449, 453 (5th Cir.1997), cert. denied, 522 U.S. 928, 118 S.Ct. 329, 139 L.Ed.2d 255 (1997) [Discharge reinstated where allegations of failure to follow procedure.]; Gibb v. World Book, Inc., 29 F.3d 411, 413 (8th Cir.1994) [No need to rigidly follow steps where policy contained permissive language.]; Anderson v. Stauffer Chemical Co., 965 F.2d 397, 402 (7th Cir. 1992) [Need not follow when not strictly mandatory.]; Life Care Centers of America, Inc. v. Dexter, 2003 WY 38, ¶¶ 11-12, 65 P.3d 385 (2003) [Discretion to avoid steps with employee in which have lost confidence under policy.]; Maryland Trans. Auth. v. King, 369 Md. 274, 799 A.2d 1246, 1253 (2002) [One incident sufficient for discharge where language indicates possibility.]; Churchey v. Adolph Coors Co., 759 P.2d 1336, 1349 (Co.1988) [Company's failure to follow policy not outrageous conduct.]; Lynn v. Camp, 2003 WL 22401280 (Tenn.Ct.App.2003) [Employee may be fired for first incident where discretion exists.]; Hanford v. City of Arnold, 49 S.W.3d 707, 711 (Mo.App.2001) [When policy provides may be dismissed for a single incident, firing following one infraction complied with policy.]; Fredon Corp. v. Zelenak, 124 Ohio App.3d 103, 705 N.E.2d 703, 708 (1997) [No need to follow where policy not mandatory.]; Dept. of Corrections v. Shaw, 217 Ga.App. 33, 456 S.E.2d 628, 630 (1995) [No abuse where do not follow policy.]; Frigm v. Unemployment Comp. Bd. of Review, 164 Pa.Cmwlth. 282, 642 A.2d 629, 631 (1994) [No need to comply when there is an exception for serious conduct.]; Hattervig v. de la Torre, 870 S.W.2d 895, 901 (Ct.App.Mo.1994) [Where policy flexible, can skip progressive steps.]; Bhatia v. Department of Employment Sec., 834 P.2d 574, 579 (Ct.App.Utah 1992) [Can act so badly as to justify ignoring policy.]; Lyles v. Department of Trans., 183 Ill.App.3d 901, 132 Ill.Dec. 270, 539 N.E.2d 833, 840 (1989), appeal denied, 127 Ill.2d 619, 136 Ill.Dec. 589, 545 N.E.2d 113 (1989) [Need not follow when conduct serious.]; Battiste v. Department of Social Serv., 154 Mich.App. 486, 398 N.W.2d 447, 450 (1987) [Although failure to consider progressive discipline found arbitrary, did not dismiss possibility that one incident would support firing.]; Pryse v. Yakima School Dist. No. 7, 30 Wash.App. 16, 632 P.2d 60, 66 (1981) [Serious conduct will excuse use of remedial procedures.]. But see, G.B. Goldman Paper Co. v. United Paperworkers Inter'l Union, Local 286, 957 F.Supp. 607, 615 (E.D.Pa.1997) [Failure to follow procedures gave arbitrator authority to fashion remedy.]; Byrd v. City of Atlanta, 709 F.Supp. 1148, 1151 (N.D.Ga. 1989) [Failure to follow when allowing for limited discharge gave rise to due process challenge.]; Local 2195, Lumber & Sawmill Workers Union v. International Paper Co., 488 F.Supp. 877, 880 (D.Oregon 1980), aff'd, 685 F.2d 443 (9th Cir. 1982) [Failure to follow precludes discharge.]; New Mexico Regulation & Licensing Dept. v. Lujan, 127 N.M. 233, 979 P.2d 744, 748-49 (1999) [Must follow steps of discipline.]; Rebel v. Unemployment Comp. Bd. of Review, 692 A.2d 304, 307 (Pa.Cmwlth.1997), appeal granted, 548 Pa. 573, 699 A.2d 732 (1997), aff'd, 555 Pa. 114, 723 A.2d 156 (1998) [Where limited to discharge for a major action and incident does not meet definition, must follow policy.]; America West Airlines, Inc. v. Tope, 935 S.W.2d 908, 914 (Ct.App.Tex. 1996) [Where company rules provided for progressive policy, jury could conclude firing unjust where not followed.]; Pickett v. Unemployment Comp. Bd. of Review, 55 Ohio App.3d 68, 562 N.E.2d 521 (1989) [Failure to follow mandatory progressive policy resulted in discharge without just cause.]. See also, Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1515 (10th Cir.1995) [Permissive statement in policy gives rise to jury question on requirement to follow steps.]; Tennes v. Commonwealth of Massachusetts, Dept. of Revenue, 944 F.2d 372, 379 (7th Cir.1991) [Failure to follow might be factor when coupled with other evidence on age discrimination.]; Randall v. Unitech Sys., Inc., 243 F.Supp.2d 822, 832 (N.D.Ill.2003) [Failure to follow alone not sufficient to show discriminatory intent.]; Lehighton Area School Dist. v. Pennsylvania Labor Relations Bd., 682 A.2d 439, 443 (Pa.Cmwlth.1996) [Failure to follow could show animus.]; In re Brooks, 135 Vt. 563, 569, 382 A.2d 204 (1977) [Can contract for progressive disciplinary policy.]; Feges v. Perkins Restaurants, Inc., 483 N.W.2d 701, 707 (Minn.1992) [Can contract for progressive disciplinary policy.]; DeBois v. Department of Employment Sec., 274 Ill.App.3d 660, 210 Ill. Dec. 874, 876, 653 N.E.2d 1336 (1995) [Have policy and fail to follow, cannot deny unemployment benefits.].
[55] Cox also argued before the Court of Civil Appeals that the administrative hearing officer did not properly memorialize the findings of fact or adequately consider circumstances outlined in Merit Protection Commission Rule OAC 455:10-9-2(C) requiring the presiding official, upon a finding that just cause existed for adverse action but did not justify the severity of the discipline imposed, to consider: the seriousness of the conduct relating to the employee's duties and responsibilities; the consistency of action taken with respect to similar conduct; the previous employment and disciplinary records of the employee; and mitigating circumstances. The argument is unconvincing. The final order specifically provides that DHS showed, by a preponderance of the evidence, that the discharge did not constitute an abuse of discretion under the facts and circumstances of the cause. Therefore, it was unnecessary for the administrative hearing officer to outline the considerations imposed by the rule.
[56] Title 75 O.S.2001 § 322, see note 3, supra; Triangle Fraternity v. City of Norman ex rel. Norman Bd. of Adjustment, see note 4, supra; Banks v. City of Bethany, see note 4, supra; Bailey v. Uhls, see note 4, supra.
[57] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 92.
[58] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 63.
[59] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 65.
[60] Transcript of hearing on petition for reconsideration, August 22, 2000, p. 66. Such a believe has, in itself, been determined to be rational support for failing to follow progressive steps in disciplining an employee. Barakat v. Taco Bell, Inc., 970 F.Supp. 634, 640 (N.D.Ill.1997).
[61] Title 74 O.S.2001 § 840-2.9. See also, Oklahoma's Anti Discrimination Act, 25 O.S.2001 § 1101 et seq.
[62] Title 74 O.S.2001 § 840-6.3, see note 1, supra.
[63] Id.
[64] Merit Protection Commission Protection Rule OAC 455:10-11-4, see note 2, supra.
[65] Title 75 O.S.2001 § 322, see note 3, supra; Triangle Fraternity v. City of Norman ex rel. Norman Bd. of Adjustment, see note 4, supra; Banks v. City of Bethany, see note 4, supra; Bailey v. Uhls, see note 4, supra.