# District of Columbia
# Court of Appeals

**No. 13-CV-778**

GEORGE WALKER,

                Appellant,



FILED

NOV 25 2015

DISTRICT OF COLUMBIA
COURT OF APPEALS

    v.

OFFICE OF THE CHIEF INFORMATION
TECHNOLOGY OFFICER,

                Appellee.

**CAP-9849-11**

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: Glickman and Beckwith, Associate Judges; and Newman, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the Superior Court is reversed, and the case is remanded to the trial court with directions to vacate the Office of Employee Appeals ("OEA") decision and remand the case to the OEA for proceedings consistent with this opinion.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: November 25, 2015.

Opinion by Associate Judge Corinne Beckwith.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 13-CV-778

GEORGE WALKER, APPELLANT,

V.

OFFICE OF THE CHIEF INFORMATION TECHNOLOGY OFFICER, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAP-9849-11)

(Hon. Peter A. Krauthamer, Trial Judge)

(Argued October 30, 2014     Decided November 25, 2015)

*Omar Vincent Melehy*, with whom *Robert Porter* was on the brief, for appellant.

*Loren L. AliKhan*, Deputy Solicitor General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the times the brief was filed, and *Todd S. Kim,* Solicitor General, were on the brief, for appellee.

Before GLICKMAN and BECKWITH, *Associate Judges*, and NEWMAN, *Senior Judge*.

BECKWITH, *Associate Judge*: George Walker is a District of Columbia government employee who was wrongfully terminated in 1996 and reinstated thirteen years later following lengthy administrative and judicial proceedings. This

case centers on Mr. Walker's right to back pay over the course of that thirteen-year period—specifically, whether Mr. Walker was required to mitigate his damages by looking for other work. The parties assert that the answer to this question depends on whether Mr. Walker's claim for back pay is governed by federal or District of Columbia law. We conclude, however, that the local law is entirely consistent with its federal counterpart. Thus whatever law is deemed to control, Mr. Walker was required to mitigate his damages by making reasonable efforts to find alternate employment during his period of unjustified separation from 1996 to 2009.

The administrative law judge (ALJ) made two errors, however, in reaching his determination that Mr. Walker did not "exercise[] reasonable and sufficient diligence" in mitigation and was therefore entitled to no back pay. First, he placed the burden on Mr. Walker to prove mitigation, when in fact the government had the burden to prove the lack of mitigation. Second, despite holding an extensive two-day hearing with multiple witnesses and voluminous evidence before the Office of Employee Appeals (OEA), he made one sweeping finding on the mitigation question rather than the period-by-period determination that is required in such a case.

While we are reluctant to order yet another remand in a case that began almost two decades ago, we cannot resolve this matter on the record before us. For

the reasons that follow, we therefore reverse the decision of the Superior Court and remand with instructions for the court to vacate the OEA's decision and send the case back to the OEA for a mitigation determination that applies the proper law, places the burden of proof on the proper party, and makes period-by-period findings to supplant the all-or-nothing determination that covered thirteen very different years with one broad brush.

## I.

On November 1, 1996, George Walker was fired from his job as a supervisory computer specialist at the D.C. Department of Administrative Services (DAS), an agency that was later subsumed by the Office of the Chief Information Technology Officer (OCTO). Mr. Walker appealed his dismissal to the OEA, and on October 19, 1998, an ALJ issued an initial decision reversing the termination and ordering that Mr. Walker be reinstated. The OEA Board affirmed that decision, and DAS appealed to Superior Court. On October 30, 2000, the court affirmed the Board's reinstatement order but, because DAS had recently been reorganized and "it would be impossible to reinstate respondent to his former position of record," remanded the case to the agency to allow the OEA to hold a hearing and "determine whether a similar and equal position exists for respondent."

The ALJ held an evidentiary hearing and issued another initial decision on December 16, 2004, identifying "Data Center Services Manager" as the appropriate position for Mr. Walker and ordering OCTO to reinstate Mr. Walker in this position. The ALJ also required OCTO to pay Mr. Walker back pay from November 1, 1996, to March 26, 1999. The judge cut off Mr. Walker's back pay at that point because the parties apparently stipulated that Mr. Walker was entitled to back pay up until March 26, 1999—the date that DAS became OCTO—and the ALJ determined that no more back pay was appropriate because Mr. Walker "did not exercise reasonable and sufficient diligence in attempting to find alternative employment after March 26, 1999." The Board affirmed the ALJ's order on April 14, 2008, both parties appealed the decision, and the case proceeded to Superior Court for a second time.

Mr. Walker's two main contentions on appeal to Superior Court were that the data services position was not comparable to his previous position and that his entitlement to back pay was governed by the Federal Back Pay Act (FBPA), which in Mr. Walker's view did not require him to search for work under the circumstances of this case. The District countered that Mr. Walker had waived the FBPA claim by raising it for the first time on appeal. On April 20, 2009, the Superior Court judge vacated the Board's order and remanded the case again. The court agreed with Mr. Walker that the position was not comparable to his previous

position because it was "a lesser position in terms of prestige and administrative and supervisory duties." The court also found the Board's decision ordering back pay through March 26, 1999, to be "unsupported by substantial evidence in the record" as the Board had improperly relied on a "stipulation of the parties" that had "no logical connection" to "the extent to which Mr. Walker mitigated his damages by seeking other employment or working on his administrative challenges to his termination." The court therefore "reluctantly" remanded the case to the OEA to "reconsider the issue of back pay" and to "consider in the first instance" Mr. Walker's argument that the Federal Back Pay Act governed whether he had a duty to mitigate his damages and whether he satisfied that duty.

On the second remand to the OEA, a different ALJ held a two-day evidentiary hearing and then issued a decision denying Mr. Walker's request for back pay. The ALJ concluded that the Comprehensive Merit Personnel Act (CMPA)[1]—and thus the rules and regulations for personnel found in the District Personnel Manual (DPM)—rather than the Federal Back Pay Act[2] applied to Mr. Walker's claim. The ALJ also determined that Mr. Walker had waived any FBPA claim by failing to raise it previously before the ALJ and that—even assuming the

---

[1] D.C. Code §§ 1-601.01 to -636.03 (2012 Repl.).

[2] 5 U.S.C. § 5596 (2012).

FBPA did apply—Mr. Walker would not be entitled to back pay because the FBPA imposes "a statutory duty [on] discharged employees to make reasonable efforts to mitigate their damages by seeking substantially equivalent employment." Turning then to the question whether Mr. Walker had "exercised reasonable and sufficient diligence" in mitigating his damages, the ALJ concluded that he had not. Mr. Walker filed a petition for review of this decision in Superior Court, and on July 2, 2012, the trial court issued an order upholding the denial of back pay and accepting, in large part, the ALJ's findings. This appeal followed.

## II.

In considering the Superior Court's review of an OEA decision, "we conduct the identical review that we would undertake if this appeal had been heard initially in this court." *District of Columbia v. Davis*, 685 A.2d 389, 393 (D.C. 1996) (quoting *Kegley v. District of Columbia*, 440 A.2d 1013, 1019 (D.C. 1982)). An OEA decision "must state findings of fact on each material, contested factual issue; those findings must be supported by substantial evidence in the agency record; and the agency's conclusions of law must follow rationally from its findings." *Johnson v. District of Columbia Office of Emp. Appeals*, 912 A.2d 1181, 1183 (D.C. 2006) (quoting *Murchison v. District of Columbia Dep't of Pub. Works*, 813 A.2d 203, 205 (D.C. 2002)). We "must affirm the OEA's decision so long as it is supported by substantial evidence in the record and otherwise in accordance with law."

*Dupree v. District of Columbia Office of Emp. Appeals*, 36 A.3d 826, 830 (D.C. 2011) (quoting *Settlemire v. District of Columbia Office of Emp. Appeals*, 898 A.2d 902, 905 n.4 (D.C. 2006)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Jahr v. District of Columbia Office of Emp. Appeals*, 19 A.3d 334, 340 (D.C. 2011) (quoting *Hutchinson v. District of Columbia Office of Emp. Appeals*, 710 A.2d 227, 230 (D.C. 1998)). We will reverse only if the OEA's decision was arbitrary, capricious, or an abuse of discretion. *See id.* On questions of law, however, our review is de novo. *See Dupree*, 36 A.3d at 831.

## III.

Before Congress passed the Home Rule Act in 1973, the FBPA specifically applied to employees of "the government of the District of Columbia" and it entitled those employees to back pay in cases of "unjustified or unwarranted" personnel action. *District of Columbia v. Brown*, 739 A.2d 832, 835 (D.C. 1999); *see also* 5 U.S.C. § 5596 (b)(1)(A)(i) (2012). As part of the Home Rule Act, Congress directed the District to establish its own personnel system, *Brown*, 739 A.2d at 835, and the Council accordingly passed the CMPA on October 31, 1978. *See id.*; D.C. Code §§ 1-601.01 to -636.03 (2012 Repl.). In 1980, the Council enacted legislation to "supersede the applicability of several federal statutes,

including the FBPA, to District employees hired on or after January 1, 1980." *See Brown*, 739 A.2d at 835; D.C. Code § 1-632.02 (2012 Repl.) *formerly* D.C. Code § 1-633.2 (a)(5)(G) (1981). On March 4, 1981, the Council amended the CMPA again and enacted D.C. Code § 1-611.04 (e), which provides that "[u]ntil such time as a new compensation system is approved, the compensation system . . . in effect on December 31, 1979, shall continue in effect[.]" D.C. Law 3-130, 28 D.C. Reg. 277 (Mar. 4, 1981). Both Mr. Walker and the District agree that, pursuant to the "jump-back" provision of D.C. Code § 1-611.04 (e), the "compensation system" in effect on December 31, 1979, controls this case. They disagree, however, about what this "compensation system" encompasses.

Mr. Walker contends that D.C. Code § 1-611.04 "makes it clear that City Council approval of the compensation system regulations is a mandatory pre-condition to the lawful superseding of the FBPA," that because new compensation system regulations were not formally promulgated until 2005, the FBPA applies to his claim for back pay, and that any reliance on D.C. law—specifically, the CMPA and the DPM regulations—was error. Mr. Walker further argues that he is entitled to full back pay under the FBPA because that statute contains no mitigation requirement and because any such common law requirement does not reach the facts of his case. More specifically, he dismisses as inapplicable "the more stringent mitigation rule in the DPM," which after a one-year grace period

conditions any award of back pay on the employee's "actively" seeking alternate work during the separation period. *See* 6B DCMR § 1149.11 (c).

For its part, the District relies on a "statutory entitlement" versus "statutory process" argument to support its contention that the DPM's mitigation rule applies to Mr. Walker's case. The District argues that in deciding whether something was part of the "compensation system" in effect on December 31, 1979, we have long recognized a "distinction between concrete statutory entitlements and benefits on the one hand and statutory processes, mechanisms, and procedures used in personnel administration on the other." *District of Columbia v. Hunt*, 520 A.2d 300, 303 (D.C. 1987). In its view, the District was required "to retain the federal personnel procedures, mechanisms, and processes only until it develop[ed] its own—as it did in the CMPA." *Id*. Because the FBPA contains no mention of mitigation, the District contends that mitigation cannot have a "concrete statutory" basis under our decision in *Hunt* and that the District therefore could fashion its own mitigation rule without enacting a "new compensation system" under D.C. Code § 1-611.04 (e) and obtaining the City Council approval required by that section.

As the District points out, our decisions in *Hunt*, 520 A.2d at 303–04, and *Zenian v. District of Columbia Office of Employee Appeals*, 598 A.2d 1161, 1163–

65 (D.C. 1991), ensure its right to control statutory "processes, mechanisms, and procedures." There is likewise authority for the District's argument that mitigation rules "are just part of the routine processes for calculating back pay awards and not 'concrete statutory entitlements' that were part of the compensation system on December 31, 1979." *See Am. Fed'n of Gov't Emps. (AFGE) v. Barry*, 459 A.2d 1045 (D.C. 1983) (holding that the District was free to discard a federal cost-of-living formula because unlike pay, tenure, and leave, the formula was not a concrete entitlement); *Hunt*, 520 A.2d at 303–04 (describing *AFGE* as a decision that "implicated precisely the kind of administrative autonomy that Congress intended the District to now exercise in the Home Rule Act"). At the same time, we question how far that reasoning can extend without undermining *Zenian*, which warned both that "the Council did not intend a narrow construction of the term 'compensation system'" and that "the FBPA is not to be applied in a piecemeal fashion." *Zenian*, 598 A.2d at 1164–65. *Zenian* thus appears to counsel against allowing changes in the "statutory processes, mechanisms, and procedures" to erode the "statutory entitlements and benefits" that were available to District employees in 1979.

Fortunately, we need not decide under *Hunt* and *Zenian* at what point a permissible procedural change becomes an impermissible substantive one. That is because we accept the government's alternative argument that the DPM's relevant

provision does not abridge but merely explains the common law mitigation requirement that has long been read into the FBPA. "Because the DPM provides an interpretation of FBPA in concert with federal holdings," the District asserts, "it does not run afoul of this Court's requirement that the compensation system in effect on December 31, 1979[,] remain intact until a new system is adopted." In making this argument, the District points to the long line of federal cases—some of which the trial court noted—holding that the common law rules of mitigation apply to back pay awards under the FBPA. *See, e.g.*, *White v. Bloomberg*, 501 F.2d 1379, 1382 (4th Cir. 1974) ("Although the Act itself does not authorize deductions based on an employee's failure to seek substitute employment . . . common law rules of mitigation apply. . . . Under this doctrine, the employer can reduce its back pay obligation by the amount the employee could have earned if he had made reasonable efforts to find another job." (citations omitted)); *Payne v. Panama Canal Co.*, 607 F.2d 155, 165 (5th Cir. 1979) (stating that "[a]n employee is under an affirmative duty to mitigate his damages in cases brought under [5 U.S.C.] § 5596"); *Naekel v. Dep't of Transp.*, 850 F.2d 682, 685 (Fed. Cir. 1988) (discussing the FBPA's "requirement that a wrongfully discharged employee make reasonable efforts to mitigate damages"). While the FBPA's text and implementing regulations are silent on whether a plaintiff must mitigate, *see* 42 Fed. Reg. 16,127, 16,127–29 (Mar. 25, 1977), there is no indication that Congress supplanted the

common law rule of mitigation, and such a requirement in fact appears in the Federal Personnel Manual (FPM) as far back as the late 1960s. *See Cunningham v. United States*, 217 Ct. Cl. 665, 666–67 (Ct. Cl. 1978). In *Cunningham*, the Court of Claims cited this FPM rule for "[m]itigation of damages,"[3] which provides that "failure to seek reemployment may be a basis for deleting a period of unjustified separation from computation . . . and the agency determines that the efforts of the employee to seek reemployment following the erroneous separation were not sufficient to warrant payment of back pay for the period of separation." That language is almost identical to the language from the DPM, whose applicability the parties dispute here:

> 8.11. When an employee has been separated from his or her position by an unjustified or unwarranted personnel action, he or she is entitled to an amount (when this action is corrected) equal to the difference between his or her earnings and the pay he or she would have received had it not been for the separation. . . . However, failure to seek reemployment may be a basis for deleting a period of unjustified separation from computation, in cases where the employee has been separated for a period longer than one year, and the department determines that his or her efforts to seek reemployment following

---

[3] Federal Personnel Manual, FPM Supp. 990-2, Installment 31, Subchapter 8 (Jan. 21, 1969).

erroneous separation were insufficient to warrant payment of back pay for the period of separation.[4]

Viewed in this way, the mitigation requirement appears remarkably settled. In fact, in *Andress v. United States Postal Service*, 56 MSPR 501 (1993), the Merit Systems Protection Board traced the FBPA's mitigation requirement back to even before the FBPA itself. The Board explained that

> [t]he duty to mitigate was initially derived by the Court of Claims from the language of one of the Back Pay Act's predecessor statutes, the Security Act of 1950, providing for deduction from the back pay award of the employee's "net interim earnings": "[T]he clearest implication . . . is that it was contemplated that the claimant would make a reasonable effort to secure other

---

[4] This version derives from the DPM that appears in the record and that the parties cite. As the trial court noted, however, this version differs slightly from the current version codified in 6B DCMR 1149. It remains unclear whether the version in the record was the one that existed on December 31, 1979; it is undated and appears to have been promulgated sometime after 1982. The court explained that "[t]he precise origin of DPM Part II, Chapter 11B is unclear as there is no record of official promulgation," but it nevertheless found cases discussing the DPM as far back as 1959, and it therefore concluded that, as "[t]hese cases show that the Court has consistently relied on the DPM before the CMPA became effective . . . . [T]he DPM was not a new compensation system that needs City Council's approval pursuant to the D.C. Code § 1-611.04(d)-(e) to become effective." Mr. Walker argues that "[t]he fatal flaw in the trial court's reasoning was its assumption that, because the case law from this Court dating back to the 1950s referenced some version of the DPM, the precise language of Part 8.11 existed on December 31, 1979, and that Part 8.11 imposed the same mitigation standard as the trial court and the OEA." Even assuming Mr. Walker's argument has merit, any error would be immaterial given the lack of evidence that the DPM's mitigation rule has ever diverged from its well-established federal counterpart.

employment and that the amount which the claimant earned, or with reasonable effort might have earned, be deducted from the total amount of compensation that would otherwise be paid under the statute." *Schwartz v. United States*, 149 Ct. Cl. 145, 147, 181 F. Supp. 408 (Ct. Cl. 1960) . . . . There is no indication in the legislative history of the Back Pay Act that Congress intended to change this rule.

*Id.* at 508. The relevant case law and regulations thus refute Mr. Walker's assertion that the DPM's mitigation rule is particularly stringent. The DPM rule, to the contrary, appears no different from either the FPM rule cited in *Cunningham* or the general common law rule that courts have grafted onto the FBPA. The District's personnel laws are by no means a model of clarity, especially the "jump-back" provision of D.C. Code § 1-611.04 (e). Even so, our conclusion finds support in the nearly identical mitigation requirements that appear in the federal and district personnel manuals, as well as in the ample case law over the last forty years that has recognized a common law duty to mitigate under the FBPA.[5]

In contending that he had no duty to mitigate, Mr. Walker relies principally on *Power v. United States*, 597 F.2d 258 (Ct. Cl. 1979)—and other cases interpreting the FBPA—to argue that an unlawfully terminated employee is not

---

[5] Irrespective of which set of regulations applies, therefore, Mr. Walker enjoyed a one-year grace period during which he had no duty to mitigate. The District has filed a supplemental letter indicating that it has compensated Mr. Walker for this period.

required to search for work unless and until the employee receives a final administrative determination upholding the removal. Because there was no such determination in this case, Mr. Walker says he never had a duty to mitigate by searching for other work. Mr. Walker's argument depends, in large part, on a particular reading of the following sentence from *Power*:

> Under the portion of this court's decision in the *Schwartz* case [] dealing with the question of when the obligation of the claimant in that case to seek other employment began . . . the proper view seems to be that a government employee who has been improperly removed from his position is not required to seek other employment while appellate administrative proceedings are in progress and the employee is endeavoring to obtain reinstatement; *but that the obligation to seek other employment does arise when the adverse action removing him from his position becomes final at the administrative level.*

*Power*, 597 F.2d at 264 (emphasis added) (citations omitted). While the excerpt admits of some ambiguity, Mr. Walker misreads the italicized clause when construing it as a broad declaration that "[t]he duty to seek other employment only arises when the adverse action removing him from his position becomes final at the administrative level." Context is key, and in that sentence, the *Power* court was discussing the claimant's duty to mitigate during the period immediately following the one-year grace period, when his administrative appeal also happened to be pending. *See id.* at 264–65 (stating that because the plaintiff was "awaiting" and "preparing for" a hearing "at the end of the 1-year period following his removal,"

"it would be unfair to hold that the plaintiff was under an obligation at that time to begin a diligent effort to obtain other employment, when he was pursuing his administrative remedies").

*Power* and similar cases, properly construed, stand for the simple proposition that "the wrongfully discharged employee reasonably spends his time on his appeal." *See Andress*, 56 MSPR at 509. *Power*'s suggestion that removal becomes final at the administrative level refers merely to the end of the period during which the employee's time is reasonably spent working on the appeal. It is not, as Mr. Walker assumes, a blanket statement that if an employee prevails on the appeal, removal is never "upheld" or "final" and the mitigation requirement is excused. The trial court aptly summarized the case law in this regard: "Federal cases interpreting 5 U.S.C. § 5596 (b)(1)(A)(i) essentially state that employees must mitigate damages after a reasonable amount of time devoted to the handling of an administrative appeal from the unwarranted personnel action."[6] On the facts

---

[6] That is a general proposition, to be sure, and none of the cases that the trial court cites specifically discusses applying the duty to mitigate to an employee—like Mr. Walker—who is holding a reinstatement order. The duty to mitigate is the duty to act reasonably, however, and the cases also state that "the plaintiff's specific situation should be taken into account." *Power*, 597 F.2d at 264. We remain unaware of any case law indicating that the duty to mitigate damages cannot apply to an employee holding a reinstatement order. In any event, it would be unclear whether such a rule would apply in a case such as the present case, where—at least according to the government—the employee's challenges to his

(continued…)

of this case, then, Mr. Walker had a duty to mitigate.

## IV.

The two-day evidentiary hearing that the ALJ held on remand from Superior Court was aimed at the right question—that is, whether Mr. Walker, considering his specific situation, sufficiently mitigated his damages, a requirement under FBPA case law and the DPM. This hearing suffered from two related errors, however. First, as Mr. Walker and the District agree, it is well established that "[t]he burden of showing mitigation of damages is on the party raising the issue," *Howard Univ. v. Lacy*, 828 A.2d 733, 739 n.8 (D.C. 2003), and that the employer can satisfy that burden by "show[ing] [the employee's] failure to take reasonable efforts to mitigate [his] damages by finding alternative employment," *Wis. Ave. Nursing Home v. District of Columbia Comm'n on Human Rights*, 527 A.2d 282, 291 (D.C. 1987).

In this case, the ALJ placed the burden on Mr. Walker, concluding that the

---

(…continued)

reinstatement contributed to the long delay. The most analogous case that the parties cite is *Coleman v. Lane*, 949 F. Supp. 604 (N.D. Ill. 1996). While the court in *Coleman* was considering back pay under a different statute, it asked whether the employee faced a "continuing duty to mitigate his losses after a favorable verdict but before actual reinstatement." *Id.* at 609. The court answered that question in the affirmative, reasoning that "a plaintiff may not for[]go all job search efforts merely because he received a favorable jury verdict." *Id.* at 609–10.

"Employee did not exercise reasonable and sufficient diligence in attempting to find alternative employment after his termination" and that he therefore "failed to meet his burden of proof that he tried to mitigate his damages." The trial court found substantial evidence in the record supporting the ALJ's decision and affirmed.

On appeal to this court, the District argues that the ALJ's mistaken reference to Mr. Walker's having failed to meet his burden of proof was harmless where the ALJ's findings "made clear that he would have found Mr. Walker's mitigation efforts insufficient no matter where the burden lay." But the ALJ's understanding of who had the burden to show mitigation appears in many respects to be central to his ultimate findings. Although he explicitly relied on cases that properly place the burden on the employer, he misstated the burden immediately before concluding that "[a]s a result of his failure to mitigate," the denial of any additional back pay for Mr. Walker was appropriate. And earlier in the hearing, the ALJ repeatedly rejected Mr. Walker's objections to procedures that placed the burden on him:

> ALJ: Any opening statements?
>
> Government's counsel: I believe the burden is on the employee to show that he mitigated his damages.
>
> Mr. Walker's counsel: There's no burden on the employee. The burden, it is very clear from D.C. Court of Appeals case law that the burden of showing that he failed to mitigate is on the agency. And there is a couple

of cases cited, Howard versus Lacey, Howard University versus Lacey.

ALJ:  Hold on a second.  The issue is whether employee mitigated his damages, not whether he did not.

Mr. Walker's counsel:  Okay.  But the way mitigation issues work is the person claiming he didn't mitigate has a duty to show that he did not mitigate.

ALJ:  First of all, the employee has a duty to mitigate.  In your opening statement, what are you going to present?  Are you going to say that he did, do you have evidence to support that he did?

Mr. Walker's counsel:  Absolutely, I have evidence to support that he did.

ALJ:  I want to hear the opening statement regarding that.  If you don't, then let me know and I'll move on.

. . . .

Mr. Walker's counsel:  . . .  But my client does not have the burden of proof here and we've agreed that he could go first to talk about his mitigation efforts.  But the agency clearly has the burden of showing that he didn't exercise reasonable mitigation efforts . . . .

. . . .

ALJ:  Call your first witness.

Mr. Walker's counsel:  Your honor, again the agency has got the burden but accepting your ruling that my client has to go first, I am calling him.

These exchanges make clear that the ALJ determinedly placed the burden to

establish mitigation on Mr. Walker.

The government's contention that the ALJ would have deemed Mr. Walker's mitigation efforts to be insufficient even if he had assigned the government the burden brings us to the second error in the ALJ's opinion—namely, the sweeping, undifferentiated nature of the decision denying Mr. Walker any back pay. We cannot say that there was substantial evidence in the record to support such a determination.

As summarized in the ALJ's order, the evidence showed that in the several months immediately following Mr. Walker's wrongful termination in 1996, he spent 100% of his time working on his appeal. Mr. Walker testified that for a few years starting in 1997 he sent out between ten and fifteen job applications per week, in addition to the four or five job searches he did online using various websites. During this time, Mr. Walker was also serving as his own advocate in his appeals process, and he testified that his pro bono efforts took sixteen hours per week. Mr. Walker testified that the number of job applications he sent began to dwindle in 1998 and eventually dried up completely by 2008. There was also extensive testimony about Mr. Walker's efforts to earn money by starting a variety of business ventures. At the hearing, the employer's vocational expert testified that Mr. Walker's job search was inadequate in many respects, and that the

information-technology field was growing during the relevant time period.  Mr. Walker admitted that he never applied to any jobs in the D.C. government, and the offers of reinstatement that he turned down loomed large at the hearing, with the ALJ observing that Mr. Walker refused several positions "that he considered beneath him" and that "[t]his is not a picture of a man desperate for work."[7]  The

---

[7]  These job offers, while never explored in detail at the hearing, were alluded to repeatedly:

> Government's counsel: Let me make sure I understand this.  It's okay for him to go into business as Walker Home Improvements.  That counts.  But unless he's hired into a specific job, he doesn't have to accept it.  Additionally, it's a totally dishonest and disingenuous statement because he knows full well that Mr. Walker was offered two jobs.  One was a manager's position which he refused and the other was the telecommunications specialist position which he accepted . . . .

> He was offered a job in 2003.  He rejected it.  It wasn't a big enough job for him.  So, he just didn't make any applications.

> . . . .

> If he wanted to go back to work and he really wanted to mitigate his damages, why did he appeal the decision giving him two and a half years back pay and why did he reject a job that the agency offered?

> ALJ: Fair question.

(continued…)

ALJ also determined that some discrepancies between Mr. Walker's hearing testimony and his prior deposition testimony undermined his credibility.

On this record, any deduction in the back pay awarded to Mr. Walker must rest not on vague and unexplored references to positions that he turned down, but on clear and reasoned findings that are particularized as to the time period of the deduction and the reasonable course of mitigation that Mr. Walker failed to follow during that period. To the extent the ALJ determined that Mr. Walker was required to have taken one of those positions as a mitigation measure, he needed to make findings to that effect that identified the position and the date it was offered, explained why turning it down was unreasonable, explored whether taking it would have prejudiced Mr. Walker's ongoing legal claims against the District, and addressed the earlier findings suggesting that the position was not comparable to the one from which Mr. Walker was wrongfully terminated.[8] In the absence of

---

(…continued)
> Mr. Walker's counsel: I don't think it is a fair question.
> First of all, the position was the wrong one . . . .

[8] Judge Kravitz, the Superior Court judge presiding over the case in 2009, made such a finding when he concluded that the position of Data Center Services Manager was not equivalent to the one from which Mr. Walker was wrongfully terminated. The judge noted that while the salary and benefits of the two jobs were roughly equivalent, the new position carried less prestige and focused primarily on computers rather than telephones. Even so, this finding does not necessarily

(continued…)

such particularized findings, the record does not contain "relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that Mr. Walker is entitled to no back pay for the entire thirteen-year period. *See Jahr*, 19 A.3d at 340 (quoting *Hutchinson v. District of Columbia Office of Emp. Appeals*, 710 A.2d 227, 230 (D.C. 1998)); *see also Murchison v. District of Columbia Dep't of Pub. Works*, 813 A.2d 203, 206 (D.C. 2002) (explaining that "[w]hen an administrative body fails to make findings on material, contested issues of fact, a reviewing court cannot fill in the gap and make its own findings. . . . [and] the court must remand the case to the agency for it to make the necessary factual determinations"). This is especially so in a case such as ours where the evidence suggests that some years were very different from others. We therefore remand for a detailed, period-by-period determination that places the burden of proof on the proper party.[9]

---

(…continued)
answer the question whether Mr. Walker was required to accept that or any other position as part of his duty to mitigate.

[9] Our conclusion that Mr. Walker faced the same duty to mitigate under both District and federal law obviates our deciding the District's argument that Mr. Walker forfeited any claim based on federal law by failing to present it to the OEA in the first instance and by acceding to the view that District law, not federal law, governed his claim. The District also argues that Mr. Walker has forfeited any challenge to the ALJ's factual findings by failing to specifically challenge those findings in his brief. While it is true that Mr. Walker's brief focuses on the claim that he was not required to mitigate at all rather than the claim that the ALJ's

(continued…)

In reaching this conclusion, we are especially mindful of the well-established proposition that an "unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position" in mitigation. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) (describing mitigation under a different statute but clarifying that the duty to mitigate is "rooted in an ancient principle of law"). "Whether rejection of the job offer [in mitigation] is reasonable depends upon the circumstances surrounding the offer and its rejection." *Ottenberg's Bakers, Inc. v. District of Columbia Comm'n on Human Rights*, 917 A.2d 1094, 1106 (D.C. 2007). Reasonableness "is determined applying an objective standard, *i.e.*, whether a reasonable person, in similar circumstances, would have rejected the offer." *Id.* In making this determination, a court may consider among other things "the terms of the offer and the reason for the former [employee's] refusal." *Id.* at 1107. On remand, the government thus bears the burden of showing that Mr. Walker was reasonably required to take a job in mitigation that a previous judge deemed not equivalent to the one from which he

---

(…continued)
findings on mitigation were flawed, we find the arguments Mr. Walker did make—namely, that the ALJ "made factual findings based upon an incorrect legal standard—placing the burden of proof on the Employee rather than the District," that "the trial court refused to overturn the decision on that basis," and that the court's decision "was harmful and reversible error" because "the District did not meet its burden of proof"—sufficient to preserve Mr. Walker's claim on appeal.

was discharged.  *See, e.g.*, *NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1320 (D.C. Cir. 1972) (stating that "it is obvious that there is no requirement that such a person seek employment [in mitigation] which is not consonant with his particular skills, background, and experience"); *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1137 (5th Cir. 1988) (noting that "a Title VII claimant's obligation to mitigate damages does not require that the claimant accept a position noncomparable or inferior to his previous position"); *cf. Ford Motor Co.*, 458 U.S. at 232 (explaining that a claimant "forfeits his right to backpay if he refuses a job *substantially equivalent* to the one he was denied" (emphasis added)).

Finally, with respect to Mr. Walker's claim for back leave, we agree with Mr. Walker that because annual leave is mentioned explicitly in the FBPA, it qualifies as a "concrete statutory entitlement" under the Act, and the District was not free to enact a less generous rule without supplanting the FBPA with a new "compensation system" pursuant to D.C. Code § 1-611.04.  Accordingly, Mr. Walker should receive the benefit of the FBPA's provision on annual leave.[10]  *See*

---

[10]  Believing that the DPM governed this issue, the trial court concluded that Mr. Walker was entitled to back leave for the period covering his wrongful separation, whether or not he mitigated his damages.  The court based this conclusion on a difference between the two relevant sections in the DPM: DPM Part II, Chapter 11B, Subpart 8.11 (the provision on back pay) mentions mitigation, but DPM Part II, Chapter 11B, Subpart 8.10 (the provision on leave) does not.  Because Subpart 8.10 states that "the usual ceilings on leave

(continued…)

*Zenian*, 598 A.2d at 1163–65; *Hunt*, 520 A.2d at 303–04. We disagree, however, with Mr. Walker's further contention that the FBPA contains no limitation on leave analogous to the District's. On the contrary, the federal regulation on which Mr. Walker relies limits the amount of annual leave he can accumulate by forcing any leave earned over a maximum amount into a separate leave account, where it must be used within a designated period of time. *See* 5 U.S.C. § 5596 (b)(1)(B)(i); 5 C.F.R. § 550.805 (g)(1). The amount of back leave to which Mr. Walker is entitled should therefore be recalculated using this federal formula. And because the federal entitlements available in 1979 provide a floor, not a ceiling, *see Zenian*, 598 A.2d at 1163–65; *Hunt*, 520 A.2d at 303–04, Mr. Walker is entitled to whichever amount is greater.[11]

---

(…continued)
accumulation must be observed as prescribed by law or regulation," the court awarded the maximum amount of leave allowable under District law.

[11] Both parties agree that in formally promulgating the DPM on February 4, 2005, the City Council approved a new "compensation system" that validly supplanted the relevant FBPA provisions pursuant to D.C. Code § 1-611.04. *See* 52 D.C.R 934 (Feb. 4, 2005). The District therefore has a colorable argument that Mr. Walker's annual leave should be calculated using the federal formula up until February 4, 2005, and the District formula after that point. We conclude that such a dual calculation is not required for two reasons. First, the District has waived that argument by failing to raise it until this appeal, despite having many opportunities to do so in proceedings since 2005. Second, because accrual under the federal regime would stop on February 4, 2005, this dual calculation would appear to force all of the excess leave that Mr. Walker accumulated until 2005 into a separate account where it must have been used by 2007. But Mr. Walker could

(continued…)

## V.

For the foregoing reasons, we reverse the judgment of the Superior Court. The case is remanded to the trial court with directions to vacate the OEA's decision and remand the case to the OEA for proceedings consistent with this opinion.

*So ordered.*

---

(…continued)

not use this leave by 2007 because he was not reinstated until 2009. We do not assume the Council intended such a strange result. *See In re Perrin*, 663 A.2d 517, 523 (D.C. 1995) ("Courts do not wallow in literalism where the plain language of a statute would lead to absurd consequences which the legislature could not have intended." (quoting *James Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989))).